UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA

ELECTRONICALLY
FILED
Aug 15 2025
U.S. DISTRICT COURT
Northern District of WV

| | |
|---|---|
| STATE OF WEST VIRGINIA *ex rel.*, John B. McCuskey, Attorney General <br><br> Plaintiff, <br><br> v. <br><br> EVERNORTH HEALTH, INC. (FORMERLY EXPRESS SCRIPTS HOLDING COMPANY); EVERNORTH CARE SOLUTIONS, INC.; EVERNORTH DIRECT HEALTH, LLC; EVERNORTH BEHAVIORAL HEALTH, INC.; EVERNORTH SALES OPERATIONS, INC.; EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; MEDCO HEALTH SOLUTIONS, INC. (FORMERLY MERCK-MEDCO); ESI MAIL ORDER PROCESSING, INC.; ESI MAIL PHARMACY SERVICE, INC.; EXPRESS SCRIPTS PHARMACY, INC.; EXPRESS SCRIPTS SPECIALTY DISTRIBUTION SERVICES, INC.; and EXPRESS SCRIPTS SALES OPERATIONS, INC., <br><br> Defendants. | COMPLAINT <br><br> Case No.:  **5:25-CV-182 (Bailey)** |

## TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION .......................................................................1

II.   PARTIES ...............................................................................................5

    A.    Plaintiff ........................................................................................5

    B.    The Express Scripts Defendants ...................................................6

III.  JURISDICTION AND VENUE .................................................................13

IV.   FACTUAL ALLEGATIONS ......................................................................14

    A.    The Role of Pharmacy Benefit Managers in Prescription
        Drug Transactions.......................................................................14

          1.    PBMs Operate on All Sides of Prescription Drug
               Transactions.................................................................14

          2.    PBM Formularies and Financial Incentives ............................15

          3.    PBMs' Role in Utilization Management .................................19

          4.    PBMs Contract with Pharmacies and Oversight of
               Dispensing ...................................................................19

    B.    Express Scripts' Role in The Opioid Epidemic ...................................20

          1.    Express Scripts and the Opioid Manufacturers
               Colluded to Ensure Virtually Unfettered Access to
               Opioids ........................................................................21

               a.    Express Scripts Negotiated with the Opioid
                    Manufacturers to Give Opioids Favorable
                    Placement on National Formularies in
                    Exchange for Rebates and Other Fees ...........................21

               b.    Express Scripts and the Opioid
                    Manufacturers Used Parity to Limit the Use
                    of Utilization Management Measures for
                    Prescription Opioids.....................................................28

i

2.     Express Scripts Misrepresented that It Was Using
       Formularies to Promote Safe Use and Appropriate
       Prescribing of Opioids ...............................................31

3.     For Over Two Decades—Even After Knowing The
       Dangers—Express Scripts Conspired With Opioid
       Manufacturers to Deceptively Market and Promote
       Opioids ......................................................................32

4.     Express Scripts Had Access to Real-Time Data
       Regarding Drug Utilization Which Gave It a
       Unique Vantage Point into the Opioid Epidemic ....................35

       a.     Express Scripts Tracks Every Prescription
              Claim It Processes Across All The Health
              Plans It Services Which Provided It With
              Uniquely Granular And Comprehensive
              Data. ................................................................37

       b.     Express Scripts Had Knowledge About The
              Opioid Epidemic And About Abuse And
              Diversion ...........................................................38

       c.     Express Scripts Failed to Timely Undertake
              Actions to Address the Opioid Epidemic that
              It Helped Create ...............................................42

              i.     Express Scripts chose not to use its
                     claims data or its UM offerings or
                     formulary placement to address
                     overprescribing, abuse, and diversion          43

              ii.    Express Scripts chose not to use its
                     "Drug Utilization Review" tools to
                     address overprescribing, abuse and
                     diversion                                        48

              iii.   Express Scripts failed to provide
                     effective controls against diversion
                     and/or to prevent the diversion and
                     abuse of opioids                                 49

5.    Two Decades After It Knew Opioids Were
      Causing a Public Health Crisis, Express Scripts
      Finally Implemented Protocols to Address the
      Opioid Epidemic ........................................................50

C.   The Express Scripts Mail Order Pharmacy Fueled the
     Opioid Epidemic By Dispensing Billions of Morphine
     Milligram Equivalents of Opioids ......................................51

     1.    The Applicable Statutes.............................................52

     2.    Express Scripts Violated West Virginia Law and
           the Federal Controlled Substances Act.....................61

D.   Facts Pertaining to the Formulary & UM Enterprise..........................67

     1.    Formation of the Formulary & UM Enterprise .......................70

     2.    The Common Purpose and Scheme of the
           Formulary & UM Enterprise ....................................78

     3.    Conduct and Participation of the Formulary & UM
           Enterprise Through a Pattern of Racketeering
           Activity ..............................................................87

     4.    Express Scripts Concealed Its Unlawful Conduct...................92

E.   Express Scripts' Pattern of Misrepresentations Has
     Continued to the Present and Serves as a Cover for Its
     Profiteering Off of the Crisis It Helped Create...................94

F.   Express Scripts' Facilitation and Encouragement of the
     Use of Opioids Was a Cause Of a Public Health Crisis in
     West Virginia..............................................................98

G.   The State's Claims Are Timely .......................................101

     1.    Continuing Violation.............................................101

     2.    Equitable Estoppel and Concealment...................102

H.   Successor Liability........................................................104

I.   Alter Ego Liability ........................................................105

    J.      West Virginia is Entitled to Exemplary Damages ............................ 105

V.    CLAIMS FOR RELIEF ................................................................................ 107

VI.    PRAYER FOR RELIEF ............................................................................... 127

VII.    JURY DEMAND ......................................................................................... 128

Plaintiff, the State of West Virginia ("Plaintiff" or "State"), by and through its Attorney General John B. McCuskey (the "Attorney General"), brings this action upon personal knowledge and upon information and belief from the investigation of counsel against Evernorth Health, Inc. (formerly Express Scripts Holding Company); Evernorth Care Solutions, Inc.; Evernorth Direct Health, LLC; Evernorth Behavioral Health, Inc.; Evernorth Sales Operations, Inc.; Express Scripts, Inc.; Express Scripts Administrators, LLC; Medco Health Solutions, Inc. (formerly Merck-Medco); ESI Mail Order Processing, Inc.; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; Express Scripts Specialty Distribution Services, Inc.; and Express Scripts Sales Operations, Inc. (referred to collectively herein as "Express Scripts").

In support of its claims, the State alleges as follows:

## I.     NATURE OF THE ACTION

1.      The State brings this action against Express Scripts—one of the nation's largest Pharmacy Benefit Managers ("PBM")—to hold it accountable for leveraging its market dominance to exacerbate the opioid epidemic, the worst man-made crisis in modern medical history.

2.      By prioritizing profits over compliance and public safety, Express Scripts violated its legal duties under West Virginia law, contributing directly to the oversupply of opioids and the deepening of opioid use disorder across the State.

3.      The opioid crisis did not emerge in a vacuum—it was ignited and perpetuated by actors across the entire pharmaceutical supply chain. Manufacturers, distributors, pharmacies, and PBMs, including Express Scripts, each played a pivotal role. While opioid manufacturers have drawn much of the public scrutiny, Express Scripts and other PBMs have worked to keep their own roles in the crisis obscured. That veil of secrecy is finally being lifted.

4.      Express Scripts has played a central—and concealed—role in enabling the widespread oversupply of opioids. Through a combination of intentional conduct, strategic partnerships, and calculated inaction, Express Scripts helped facilitate the unchecked prescribing, dispensing, and sale of opioids in West Virginia. As a key intermediary between drug manufacturers, pharmacies, and insurers, Express Scripts inserted itself directly into the supply chain and, in doing so, assumed legal duties to act responsibly. It failed to do so.

5.      As alleged in detail throughout this Complaint, Express Scripts contracts with drug manufacturers, the pharmacies that dispense the drugs, and the payors who finance them. As a result, it occupies a uniquely powerful position—sitting at the center of the prescription drug ecosystem. Rather than using this influence to safeguard public health, Express Scripts fueled the opioid crisis from behind the scenes while projecting an image of public concern.

6.      Express Scripts' misconduct was complex, far-reaching, and violated West Virginia law in multiple, distinct ways, including but not limited to:

- Conspiring with opioid manufacturers, to deceptively market opioids and manipulate public perception regarding their safety and addictive potential;

- Securing preferred formulary placement for opioids in exchange for substantial rebates and fees—thereby incentivizing increased sales and undermining clinical judgment;

- Eliminating or weakening utilization management ("UM") protocols, such as prior authorization and quantity limits, which are designed to prevent excessive or inappropriate prescribing;

- Ignoring overwhelming internal and external data that signaled widespread abuse, over prescription, and patterns of diversion—choosing profit over public safety; and

- Dispensing opioids through mail-order pharmacies without adequate controls or oversight, in clear violation of West Virginia and federal controlled substances laws.

7.      Express Scripts' misconduct was enabled by its unmatched combination of access, influence, and insight into the West Virginia prescription drug system. Though originally created to handle administrative tasks, Express Scripts has evolved into a powerful gatekeeper that dictates drug access, availability, and pricing.

8.      But Express Scripts is not only a PBM. It is also one of the largest pharmacies in the West Virginia, operating two of the largest mail-order pharmacy platforms and functioning as a vertically integrated drug company under the ownership of Cigna. Express Scripts possesses vast data assets, including real-time prescription and claims information, which it uses for analytics, consulting, and targeted marketing. This data gave the company detailed insight into opioid prescribing trends in West Virginia

9.      With this data, Express Scripts could identify red flags—including prescribers writing high volumes of opioid prescriptions, patients filling prescriptions from multiple providers or pharmacies, and the use of dangerous drug combinations. It also had access to refill patterns and overdose data. Despite this visibility, Express Scripts failed to act and continued to prioritize revenue over public safety.

10.     Through its control over formularies and UM programs, Express Scripts had the power to limit access to high-risk opioids. Instead, it granted favorable formulary status to opioids, removed safety checks, and facilitated broader distribution—all while collecting substantial rebates and fees from manufacturers.

11.     Express Scripts' default formularies and UM protocols were widely adopted by plan sponsors, many of whom lacked the expertise or leverage to modify them. In practice, this meant that Express Scripts dictated which opioids were available and how easily they could be obtained.

3

12.    Rather than use its influence and data to reduce harm, Express Scripts actively supported opioid manufacturers by helping plan marketing strategies, analyzing sales, and shaping formularies to maximize opioid utilization. These actions were taken in exchange for financial incentives.

13.    Express Scripts and opioid manufacturers formed an association-in-fact enterprise, the "Formulary & UM Enterprise" with the shared objective of maximizing opioid sales regardless of the public health consequences. Express Scripts participated in this enterprise by coordinating formulary and UM actions to increase prescribing, supporting misleading promotional efforts, and failing to comply with state and federal controlled substance laws. This conduct deceived the State, consumers within the State, and undermined the public assurances Express Scripts made to its clients and the healthcare system.

14.    Although Express Scripts now points to remedial measures adopted under public scrutiny, its prior conduct reveals a clear pattern: it prioritized profit over compliance, safety, and the health interests of the State. Rather than using its data analytics capabilities to identify and mitigate the harms of excessive opioid distribution, Express Scripts sold these services to opioid manufacturers, enabling the manufacturers to refine their false, deceptive, and misleading marketing strategies to increase opioid sales within the State.

15.    The consequences were devastating. Prescription opioid use exploded. Sales soared. The State was flooded with unnecessary, dangerous medications. Express Scripts profited at every point in the chain—from rebates and fees, to pricing spreads, to the sale of healthcare data, to consulting arrangements with opioid manufacturers. Express Scripts was not a passive actor. It was an architect of the crisis.

16. Express Scripts helped build and sustain the firestorm that has devastated the State. It must be held accountable.

II. **PARTIES**

A. **Plaintiff**

17. Plaintiff, the State of West Virginia, by and through its Attorney General, John B. McCuskey, appears to protect the interests of the State. The Attorney General is authorized by the West Virginia Constitution, West Virginia common law and by statute to bring this action.

18. John B. McCuskey is the duly elected Attorney General of West Virginia, an independent constitutional officer of the State of West Virginia and its chief law officer, with full authority to institute and prosecute all civil actions in which the State has an interest.

19. The Attorney General is charged with enforcing the West Virginia Consumer Credit and Protection Act, W. Va. Code §§ 46A-1-101, *et seq*. ("WVCCPA"). Pursuant to W. Va. Code § 46A-7-108, the Attorney General is authorized to bring a civil action for violations of the WVCCPA and for other appropriate relief. *See State ex rel. McGraw v. Imperial Mktg.*, 506 S.E.2d 799, 811-12, 203 W. Va. 203 (1998). The Attorney General has all common law powers except those restricted by statute. *State ex rel. Discover Financial Services, Inc. v. Nibert*, 744 S.E.2d 625, 231 W. Va. 227 (2013).

20. To protect the quasi-sovereign interests in the public health and general welfare of the State, recover relief for past, ongoing, and future harms to these interests, and to address the opioid epidemic caused, in part, by Express Scripts' conduct, the Attorney General, on behalf of the State, has standing as *parens patriae* to bring this action.

21. The State is entitled to the protections of sovereign immunity. Pursuant to Article VI, Section 35 of the West Virginia Constitution and West Virginia Code §55-17-4(3), the filing

of this action shall not be construed as a waiver of that immunity and no counterclaim, set-off, recoupment, cross-claim, or other form of avoidance may be asserted in this action against the State of West Virginia.

**B.    The Express Scripts Defendants**

22.    **Defendant Evernorth Health, Inc.** (f/k/a Express Scripts Holding Company) ("Evernorth") is a Delaware corporation. Evernorth's principal place of business is at One Express Way, St. Louis, Missouri 63121.

23.    Evernorth is the parent company to each of the Express Scripts entities that were named as Express Scripts. Evernorth, through its executives and employees, controls the enterprise-wide policies that inform all of Express Scripts' lines of business in order to maximize profits across the corporate family. At all material times herein, Evernorth was transacting business in West Virginia and its conduct had a direct effect in West Virginia.

24.    **Defendant Evernorth Care Solutions, Inc.** is a Delaware corporation with its principal place of business at One Express Way, St. Louis, Missouri 63121. Evernorth Care Solutions, Inc. is registered to do business in West Virginia and may be served through its registered agent CT Corporation System, 5098 Washington St. W., Suite 407, Charleston, WV, 25313. At all times material herein, Evernorth Care Solutions, Inc. was transacting business in West Virginia and its conduct had a direct effect in West Virginia.

25.    **Defendant Evernorth Direct Health, LLC** is a Delaware limited liability company with its designated office address at 5400 D Big Tyler Road, Charleston, WV, 25313. Evernorth Direct Health, LLC is registered to do business in West Virginia and may be served through its registered agent CT Corporation System, 5098 Washington St. W., Suite 407, Charleston, WV, 25313. At all times material herein, Evernorth Direct Health, LLC was transacting business in West Virginia and its conduct had a direct effect in West Virginia.

26.    **Defendant Evernorth Behavioral Health, Inc.** is a Minnesota corporation company with its principal place of business at 6625 West 78th Street, Bloomington, MN, 55439. Evernorth Behavioral Health, Inc. is registered to do business in West Virginia and may be served through its registered agent CT Corporation System, 5098 Washington St. W., Suite 407, Charleston, WV, 25313. At all times material herein, Evernorth Behavioral Health, Inc. was transacting business in West Virginia and its conduct had a direct effect in West Virginia.

27.    **Defendant Evernorth Sales Operations, Inc.** is a Delaware corporation company with its principal place of business at One Express Way, St. Louis, Missouri 63121. Evernorth Sales Operations, Inc. is registered to do business in West Virginia and may be served through its registered agent CT Corporation System, 5098 Washington St. W., Suite 407, Charleston, WV, 25313. At all times material herein, Evernorth Sales Operations, Inc. was transacting business in West Virginia and its conduct had a direct effect in West Virginia.

28.    **Defendant Express Scripts, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Evernorth. Express Scripts, Inc.'s principal place of business is at One Express Way, St. Louis, Missouri 63121.

29.    Express Scripts, Inc. is the immediate or indirect parent of pharmacy and pharmacy benefit manager subsidiaries that operate throughout West Virginia and that engaged in the conduct that gives rise to this Complaint.

30.    Express Scripts, Inc. is registered to do business in West Virginia and may be served through its registered agent: CT Corporation System, 5098 Washington St. W. Ste. 407, Charleston, WV, 25313-1561.

31. During the relevant time period, Express Scripts, Inc. was directly involved in the PBM and mail order services businesses, including with respect to opioid drugs, as well as in Express Scripts' data and research services, all of which had a direct impact on West Virginia.

32. **Defendant Express Scripts Administrators, LLC**, is a Delaware limited liability company and a wholly owned subsidiary of Evernorth. Express Scripts Administrators, LLC's principal place of business is at the same location as Express Scripts, Inc.

33. Express Scripts Administrators, LLC is registered to do business in West Virginia and may be served through its registered agent: CT Corporation System, 5098 Washington St. W. Ste. 407, Charleston, WV, 25313-1561.

34. During the relevant time period, Express Scripts Administrators, LLC provided the PBM services in West Virginia that are alleged in this Complaint.

35. Express Scripts Administrators, LLC applied for and holds an active license with the West Virginia Insurance Commissioner to operate as a pharmacy benefits manager in the state of West Virginia.

36. **Defendant Medco Health Solutions, Inc.** (f/k/a Merck-Medco) ("Medco") is a Delaware corporation with its principal place of business located at One Express way, Sant Louis, MO 63121, and is a wholly owned subsidiary of Evernorth. Medco Health Solutions, Inc. was previously known as Merck-Medco. Merck-Medco was acquired in the early 1990s by Merck & Co. as its PBM subsidiary. In 2002, Merck & Co. spun off Merck-Medco into a publicly traded company, defendant Medco Health Solutions, Inc.

37. Medco Health Solutions, Inc. is registered to do business in West Virginia and may be served through its registered agent: CT Corporation System 5098 Washington St. W. Ste. 407,

Charleston, WV, 25313-1561. At all times material herein, Medco was transacting business in West Virginia and its conduct had a direct effect in West Virginia.

38.     **Defendant ESI Mail Order Processing, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Evernorth.

39.     ESI Mail Order Processing, Inc. may be served through its registered agent: CT Corporation System, 5098 Washington St. W. Ste. 407, Charleston, WV, 25313-1561.

40.     During the relevant time period, ESI Mail Order Processing, Inc. provided the mail order pharmacy services in West Virginia, alleged in this Complaint, which gave rise to the causes of action herein.

41.     **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and a wholly owned subsidiary of Evernorth Health, Inc. ESI Mail Pharmacy Service, Inc.'s principal place of business is at the same location as Express Scripts, Inc.

42.     ESI Mail Pharmacy Service, Inc. is registered to do business in West Virginia, and may be served through its registered agent: CT Corporation System, 5098 Washington St. W. Ste. 407, Charleston, WV, 25313-1561.

43.     ESI Mail Pharmacy Service, Inc. currently holds active licenses with the West Virginia Board of Pharmacy and is registered with the DEA to dispense controlled substances, including opioids.

44.     During the relevant time period, ESI Mail Pharmacy Service, Inc. provided the mail order pharmacy services in West Virginia, alleged in this Complaint, which gave rise to the causes of action herein.

45.     **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and a wholly owned subsidiary of Evernorth Health, Inc., Express Scripts Pharmacy, Inc.'s principal place of business is at the same location as Express Scripts, Inc.

46.     Express Scripts Pharmacy, Inc. is registered to do business in West Virginia and may be served through its registered agent: CT Corporation System, 5098 Washington St. W. Ste. 407, Charleston, WV, 25313-1561.

47.     During the relevant time period, Express Scripts Pharmacy, Inc. provided the mail order pharmacy services in West Virginia, alleged in this Complaint, which gave rise to the causes of action herein.

48.     Express Scripts Pharmacy, Inc.; ESI Mail Order Processing, Inc.; and ESI Mail Pharmacy Service, Inc. are referred to herein collectively as the "Express Scripts Mail Order Pharmacy."

49.     In 2021, Express Scripts Mail Order Pharmacy was the third largest dispensing pharmacy in the United States and made $54.4 billion in prescription revenues.

50.     From 2006 to 2014, Express Scripts Mail Order Pharmacy bought over 22.9 billion MMEs of opioids spread over 1.1 billion opioid dosage unites.

51.     **Defendant Express Scripts Specialty Distribution Services, Inc.** is a Delaware corporation and a wholly owned subsidiary of Evernorth Health, Inc., Express Scripts Specialty Distribution Services, Inc.'s principal place of business is at the same location as Express Scripts, Inc.

52.     Express Scripts Specialty Distribution Services, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

53.    During the relevant time period, as alleged in more detail herein, Express Scripts Specialty Distribution Services, Inc. worked directly with the opioid manufacturers to expand the opioid market in West Virginia, and to administer and dispense opioids through these opioid manufacturers' Patient Assistance Programs.

54.    **Defendant Express Scripts Sales Operations, Inc.** is registered to do business in West Virginia and may be served through its registered agent: CT Corporation System, 5098 Washington St. W., Suite 407, Charleston WV, 25313. At all times material herein, Express Scripts Sales Operations, Inc. was transacting business in West Virginia and its conduct had a direct effect in West Virginia.

55.    Collectively, Defendants Evernorth Health, Inc. (formerly Express Scripts Holding Company); Evernorth Care Solutions, Inc.; Evernorth Direct Health, LLC; Evernorth Behavioral Health, Inc.; Evernorth Sales Operations, Inc., Express Scripts, Inc.; Express Scripts Administrators, LLC; Medco Health Solutions, Inc.; ESI Mail Order Processing, Inc.; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; Express Scripts Specialty Distribution Services, Inc.; Express Scripts Sales Operations, Inc., including all predecessor and successor entities, are referred to as "Express Scripts" or "ESI."

56.    Express Scripts is named as a defendant in its capacities as a: (1) PBM; (2) data, analytics, and research provider; and (3) mail order pharmacy. During the relevant time period, Express Scripts contracted directly with the opioid manufacturers in each of these capacities. At all relevant times, Express Scripts performed these services in West Virginia.

57.    In 2019, Express Scripts merged with Cigna, Inc. Prior to merging with Cigna, Express Scripts was the largest independent PBM in the United States.

58.     In 2012, Express Scripts acquired Medco in a $29 billion deal. Prior to 2012, Express Scripts and Medco were separate companies. Standing alone, these companies were two of the largest PBMs in the United States and had been since at least the mid-1990s.

59.     As a result of the merger, the combined Express Scripts was formed and became the largest PBM in the nation.

60.     Following the merger, all of Medco's PBM and data and research functions were combined into Express Scripts. The combined company (Medco and Express Scripts) continued under the name Express Scripts with all of Medco's clients becoming Express Scripts' clients and Medco's top executives becoming Express Scripts executives.

61.     Express Scripts is now one of the largest PBMs in the United States, with annual revenue (as of 2023) of over $150 billion. Express Scripts provides pharmacy benefit services to more than 100 million Americans, filling over 1.4 billion prescriptions per year.

62.     At all times relevant hereto, Express Scripts offered pharmacy benefit management services in West Virginia and maintained various standard, national drug lists that were offered to and used by Express Scripts' clients in West Virginia, and were utilized by prescription drug benefit plans in West Virginia throughout the relevant time period. At all times relevant hereto, those formularies dictated the terms of reimbursement for opioids dispensed in West Virginia.

63.     Express Scripts offers pharmacy benefit services to a variety of plan sponsors with covered lives in West Virginia, including both large national companies and local/regional businesses.

64.     In West Virginia, Express Scripts (and/or its predecessors) processed claims for opioids dispensed pursuant to Express Scripts' national guidelines and drug lists throughout the opioid epidemic and continuing to the present.

65.     At all times material herein, Express Scripts (and/or its predecessors) transacted business in West Virginia and its conduct had a direct effect in West Virginia. Upon information and belief, Express Scripts derived and continues to derive substantial revenue as a result of managing pharmacy benefits throughout West Virginia.

### III.     JURISDICTION AND VENUE

66.     This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1331 because the State's claims under the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961, *et seq*., raise a federal question. This Court has supplemental jurisdiction over the State's state-law claims under 28 U.S.C. § 1367 because those claims are so related to the RICO claim as to form part of the same case or controversy.

67.     This Court also has personal jurisdiction over Express Scripts because it, through its authorized agents, servants and employees, regularly transacted business in West Virginia and further through its acts and omissions tortiously caused injuries in West Virginia by engaging in a persistent course of conduct in West Virginia that violated federal and West Virginia law. Moreover, Express Scripts derived substantial revenue as the result of the controlled substances that were distributed to West Virginia entities and later consumed by persons then residing in West Virginia.

68.     This Court also has personal jurisdiction over Express Scripts because it is registered with the Secretary of State to conduct business in West Virginia and has purposefully availed itself of this forum. Express Scripts transacted or solicited business, derived revenue from products and services, and caused tortious injury in West Virginia—both by acts committed within the State and acts committed outside the State that produced harm within it. It has sufficient minimum contacts to support the exercise of jurisdiction.

69.     Venue is appropriate in the Wheeling Division of the Northern District of West Virginia because Express Scripts transacts business in, maintains agents, or is otherwise found in the District and Division, and because a substantial part of the events or omissions giving rise to this action took place, or had their ultimate injurious impact, within the District. In particular, at all times, Express Scripts provided pharmacy benefit services, provided mail-order pharmacy services, employed sales representatives, promoted and sold opioids in Brooke, Hancock, Marshall, Ohio and Wetzel Counties within the District and Division, and caused injury to the State of West Virginia in this District and Division.

70.     This Court further has venue over this action pursuant to 28 U.S.C. § 1391.

## IV.     FACTUAL ALLEGATIONS

### A.     The Role of Pharmacy Benefit Managers in Prescription Drug Transactions

#### 1.   PBMs Operate on All Sides of Prescription Drug Transactions

71.     In the United States, drug distribution typically involves three transactions. A drug manufacturer sells its product to a wholesaler, the wholesaler supplies pharmacies, and the pharmacies then dispense the medications to consumers, with costs shared between the consumer and his/her health insurance plan.

72.     PBMs do not take physical custody of drugs or directly distribute them. Instead, they sit at the center of prescription drug dispensing—they contract with the drug manufacturers to determine which drugs are covered by insurers and at what reimbursement rates. They also contract with pharmacies to establish dispensing terms and reimbursement structures. Finally, they are hired by their clients, third-party payors such as consumer health insurance plans, to administer pharmacy benefits for consumers, including processing claims and managing patients' out-of-pocket costs.

73.     PBMs contract with their third-party payor health insurance clients to make safe and effective drug therapies available to their covered lives. But, they are also paid by drug manufacturers to provide the greatest access to their products, so as to increase sales, with little to no regard for safety or efficacy. And they are also paid by the pharmacies that fill plan beneficiaries' prescriptions, both to verify coverage and to ensure that a prescription is appropriate. Thus, in any given transaction, the PBM, including in this case Express Scripts, may be receiving money from both the insurer client and the pharmacy to exercise independent judgment about whether to authorize payment for a prescription, while also receiving money from the manufacturer to ensure that the sale is made. This business model is unmistakably rife with conflicts of interest and self-dealing, through which PBMs have enriched themselves at the expense of their clients and the public. More so, inherent in the services offered by the PBMs in their agreements with the opioid manufacturers (and with pharmacies) are the same services for which they are already ostensibly receiving payment from their clients, albeit with the incentives often running in the opposite direction, as depicted below:



2.    PBM Formularies and Financial Incentives

74.     By simultaneously engaging with manufacturers, pharmacies, and insurance plans, PBMs, including Express Scripts, wield significant influence over drug prescribing, dispensing,

and sales in the United States and in West Virginia through their control of formularies. Formularies—lists of drugs covered by health insurer plans—determine which medications are accessible to patients, under what conditions, and at what costs. Typically structured in tiers, formularies favor certain drugs by offering lower copays for preferred brands, while excluding or disadvantaging nonpreferred alternatives. Manufacturers secure favorable formulary placement often by paying a PBM in the form of a "rebates"[1] or other fees.

75.     PBMs offer formularies to clients for managing drug benefits and defining coverage. These formularies directly influence prescribing behavior and patient access: drugs listed on preferred tiers are less expensive for patients, making physicians more likely to prescribe them and patients more likely to fill those prescriptions. Driving utilization through formulary design is not incidental—it is a core function of a PBM business operation.

76.     PBMs' clients, including health insurers and government payors, rely heavily on the PBMs' expertise in constructing formularies. Even sophisticated clients often adopt a PBMs' standard national formularies with minimal modification. As a result, PBMs, such as Express Scripts in this case, effectively determine drug access and utilization for more than 100 million Americans, giving it immense leverage in negotiating rebate agreements with drug manufacturers, including opioid producers.

77.     As alleged throughout this Complaint, Express Scripts exploited its market dominance to structure standard formularies in ways that expanded access to opioids. It entered into a *quid pro quo* arrangement with opioid manufacturers—lowering barriers to patient access

---

[1] PBMs do at times share manufacturer rebates with their clients; however, they generally pass through only a portion (if any) of these rebates to their clients and retain the rest as profits.

in exchange for increased rebate payments. These financial incentives compounded over time, as greater opioid sales generated larger rebates and, in turn, higher profits for Express Scripts.

78.     Rebates paid by manufacturers are tied to favorable formulary placement, while drugs placed on non-preferred tiers may not generate any rebates at all. Thus, Express Scripts is financially incentivized to prioritize opioids on their formularies in preferred tiers, despite known risks, to maximize rebate income.

79.     Higher dispensing volumes also allow Express Scripts to negotiate higher rebates in future contracts, further increasing its revenues. Additionally, Express Scripts profits from spread pricing, where it charges clients more for a drug than it reimburses pharmacies, especially lucrative in the context of generic opioids.

80.     Express Scripts also receives significant undisclosed payments from opioid manufacturers in the form of "administrative" or "service" fees, purportedly for formulary management and related services—duties it was already being paid to perform by its clients. By relabeling rebates and using opaque accounting practices, Express Scripts has concealed these financial arrangements, avoiding contractual obligations to pass through these payments and further obscuring its role in driving opioid utilization. As industry expert Linda Cahn observed, "[i]f a PBM enters into contracts with drug manufacturers and chooses to give rebates another name—like administrative fees or health management fees or grants—the PBM will arguably eliminate its obligation to pass through the financial benefits to its clients.[2]

---

[2] *See* Jeanne Pinder, *Don't Get Trapped By PBM's Rebate Labeling Games: Managed Care magazine* by Linda Cahn" Clear Health Costs (Feb. 26, 2018), https://clearhealthcosts.com/blog/2018/02/dont-get-trapped-pbms-rebate-labeling-games-managed-care-magazine/.

81.     For example, Express Scripts' standard form of contract discloses that it receives "administrative fees" for, among other things, providing opioid manufacturers access to "drug utilization data, and receives "service fees" (which are explicitly described as separate from both rebates and administrative fees) for "formulary compliance initiatives, clinical services, therapy managements services, education services, and medical benefit management services":

> ESI provides administrative services to formulary rebate contracted manufacturers, which include, for example, maintenance and operation of the systems and other infrastructure necessary for managing and administering the PBM formulary rebate process and access to drug utilization data, as allowed by law, for purposes of verifying and evaluating the rebate payments and for other purposes related to the manufacturer's products. ESI receives administrative fees from the participating manufacturers for these services. These administrative fees are calculated based on the price of the rebated drug or supplies along with the volume of utilization and do not exceed the greater of (i) 4.58% of the average wholesale price, or (ii) 5.5% of the wholesale acquisition cost of the products. In its capacity as a PBM company, ESI also may receive service fees from manufacturers as compensation for the performance of various services, including, for example, formulary compliance initiatives, clinical services, therapy management services, education services, medical benefit management services, and the sale of non-patient identifiable claim information. These service fees are not part of the formulary rebates or associated administrative fees.[3]

82.     As reported by *Barron's* in 2024, according to one year of sales data in 2016 and 2017, Express Scripts received $85 million in the form of fees and other compensation related to Oxycontin prescriptions.[4]

83.     In sum, Express Scripts had a financially entrenched interest in maintaining and increasing opioid prescriptions because it profited from every angle of the opioid transaction—paid by the manufacturers, the pharmacies, and the payors—all while shaping access and demand through its formularies. Its actions were not passive—they were integral to the design and

---

[3] ESI_JEFFCOMO_000231588 (1/1/14).

[4] https://www.barrons.com/articles/pbm-drug-prices-insulin-opioid-crisis-dcf9e83c.

expansion of a system that prioritized profits over safety, directly contributing to the scale and severity of the opioid crisis.

3. <u>PBMs' Role in Utilization Management</u>

84. In addition to formulary design, PBMs, including Express Scripts in this case, develop and offer standard drug UM programs—rules intended to regulate access to medications. These tools include: (i) quantity limits: caps on the dosage or supply a patient can receive; (ii) step therapy: requiring patients to try alternative treatments before receiving the prescribed drug; and (iii) prior authorizations: requiring a prescriber to justify the medical necessity of a prescription before it can be filled.

85. PBMs, including Express Scripts, typically offer UM programs as part of their standard service packages, which most clients adopt with minimal or no customization thereby allowing Express Scripts to exert significant influence over drug utilization patterns across the healthcare system.

4. <u>PBMs Contract with Pharmacies and Oversight of Dispensing</u>

86. As part of their central role in the prescription drug supply chain, PBMs also contract directly with retail pharmacies to facilitate the dispensing of medications to patients.

87. Express Scripts, for example, maintains a network of approximately 65,000 retail pharmacies, encompassing over 98% of all U.S. retail pharmacies. Pharmacies that contract with the PBM become part of its provider network, meaning patients can obtain prescriptions at these locations under its pharmacy benefit plans.

88. When a patient fills a prescription at an in-network pharmacy, the PBM coordinates payment: the patient pays a copayment, and the PBM reimburses the pharmacy for the balance. This real-time processing eliminates the need for patients to pay out-of-pocket and later seek reimbursement.

89.     PBMs determine both the copay amount and the reimbursement rate for each covered medication—figures typically based on pre-set pricing structures tied to its standard formulary. In doing so, the PBMs, including Express Scripts, exert significant influence over the actual cost and access to medications at the pharmacy level.

90.     Importantly, Express Scripts also receives real-time claims data from pharmacies at the point of sale, as part of their electronic adjudication of claims, which includes determining eligibility for reimbursement and conducting concurrent drug utilization ("cDUR")—a process intended to flag safety concerns such as dangerous drug interactions or high-risk prescriptions like opioids.

91.     Express Scripts routinely failed to implement or enforce adequate cDUR protocols for opioids, allowing the widespread and unchecked dispensing of addictive drugs—even as it had the real-time data and authority to intervene.

**B.    Express Scripts' Role in The Opioid Epidemic**

92.     Express Scripts played a central role in fueling the opioid epidemic through a pattern of conduct that promoted the oversupply and overuse of prescription opioids. Express Scripts is legally responsible for: (i) knowingly or negligently colluding with manufacturers to expand opioid supply through misrepresentations and omission of known risks; (ii) undertaking and failing to implement safe formulary design, UM protocols, and drug utilization review processes, despite publicly representing that it would do so; (iii) deliberately choosing to avoid implementing restrictions, even while possessing detailed data showing that unrestricted opioid access was causing, and would continue to cause, foreseeable harm to West Virginia and its residents; and (iv) violating West Virginia state laws by failing to maintain required safeguards in both dispensing operations and broader benefit management practices, thereby facilitating diversion and abuse.

93.     Through these actions and omissions, Express Scripts not only breached its legal obligations, but directly contributed to the widespread harm caused by the opioid epidemic. Its conduct was false, deceptive, or misleading, unlawful, intentional and/or negligent, and warrants accountability under West Virginia law.

        1.    <u>Express Scripts and the Opioid Manufacturers Colluded to Ensure Virtually Unfettered Access to Opioids</u>

           a.    Express Scripts Negotiated with the Opioid Manufacturers to Give Opioids Favorable Placement on National Formularies in Exchange for Rebates and Other Fees

94.     As summarized above, Express Scripts holds significantly more market power than the drug manufacturers with which it negotiates, giving it the leverage to extract substantial rebates and fees in exchange for favorable formulary placement. This imbalance enabled Express Scripts to enter into secretive agreements with opioid manufacturers—agreements that fueled an illegal scheme to boost opioid sales while hiding key financial terms from its own health plan clients.

95.     These arrangements remained largely hidden until confidential documents were disclosed in *In re: National Prescription Opiate Litigation*, Case No. 1:17-md-2804 (N.D. Ohio), and related proceedings, revealing how undisclosed PBM-manufacturer agreements contributed to the widespread oversupply of opioids across the United States.[5]

96.     In the late 20th century, Express Scripts operated what were known as "open" formularies, which provided plan coverage for nearly all FDA-approved drugs—albeit with

---

[5] Documents produced in the National Opioid Litigation and cited within this Complaint and other opioid litigations provide countless examples of evidence of the PBM Express Scripts' collusion with opioid manufacturers to drive sales of opioids in exchange for rebates. *See, e.g., Attorney General Dana Nessel on Behalf of the People of the State of Michigan v. Express Scripts, et. al,* Case No. 24-01567 (Wayne County Ct., Mich. 2024) (citing *In re National Prescription Opiate Litigation – PBM Cases*, No. 17-2804 (N.D. Ohio); Commonwealth of Kentucky *ex rel.* Russell Coleman, Attorney General, v. Express Scripts, *et. al*, Case No. 24-CI-00594 (Jessamine Circuit Court, Div. I).

varying degrees of access and cost-sharing. Under this model, manufacturers competed to have drugs strategically positioned on formularies to ensure maximum accessibility and minimal patient cost, thereby increasing utilization. As a result, Express Scripts, and other PBMs, gained significant leverage to extract rebates in exchange for favorable placement.

97.     By the 2000s, however, Express Scripts began transitioning from "open" formularies to "closed" formularies as its standard offering. Unlike open formularies, which covered most FDA-approved drugs, closed formularies limit the number of covered drugs and impose tiered benefit structures, effectively controlling access and cost-sharing. For the past two decades, the majority of Express Scripts' covered lives have been governed by these more restrictive formularies.

98.     Express Scripts recognized it could leverage the exclusivity provided by "closed formularies" to its financial gain, which it has now has done for more than two decades.

99.     Indeed, since at least 2000, Express Scripts extracted millions of dollars in rebates and other fees from prescription opioid manufacturers in exchanged for preferred formulary placement for the manufacturers' opioid products. The prescription opioid manufacturers were eager participants in this enterprise because of the virtually unrestricted formulary status they purchased for their drugs in exchange for rebates and other fees paid to Express Scripts.

100.    From the outset, opioid manufacturer Purdue Pharma L.P.'s ("Purdue") goal was clear: push OxyContin aggressively. As early as 1996, Purdue instructed its sales force to promote OxyContin as the drug of choice for a wide range of pain conditions, both cancer and non-cancer. The result was staggering—OxyContin sales surged to nearly $2 billion annually by 2003, and prescriptions for non-cancer pain grew nearly tenfold, from 670,000 in 1997 to 6.2 million in 2002.

101.    During the period of rapidly expanding OxyContin sales, Medco, then the largest PBM in the U.S. and later acquired by Express Scripts, emerged as Purdue's largest customer. In 1996, Medco received over one-third of all rebates paid by Purdue for opioid sales. By 2001 and 2002, Medco's gross sales of Purdue opioids reached $250.4 million and $281 million, respectively—establishing it as Purdue's top purchaser.[6]

102.    When OxyContin was first introduced, however, Medco initially took steps to limit its use. In early 1996, Medco implemented a "ceiling dose" restriction of 80 mg per day, citing concerns over the drug's high potential for abuse.[7]

103.    In January 1997, Purdue was notified by pain clinic physicians that Medco was sending letters to prescribers expressing concern about the abuse potential of OxyContin, particularly when used to treat chronic non-malignant pain.[8] These concerns were escalated to senior Purdue leadership, including then-President Richard Sackler.[9] In response, Purdue's head of marketing and sales, James Lang, acknowledged the growing scrutiny, stating: "Our success with OxyContin is starting to create concerns amongst the large PBMs . . . because they recognize we are targeting non-cancer pain. This goes beyond their initial perception that [OxyContin] was primarily a cancer pain medication."[10]

104.    Although Medco initially framed its concerns as focused on addiction and abuse, several Purdue executives viewed this as a pretext, suspecting that Medco's real motivation was to reduce costs and demand higher rebates. When Purdue's medical director, Dr. Paul Goldenheim,

---

[6] PPLPC012000064369.

[7] PDD1715057333.

[8] E513_00045035.

[9] E513_00006452; E513_00045035; PDD9316506319.

[10] *Id.*

proposed engaging with Medco on the issue of addiction, Purdue President Richard Sackler responded skeptically, stating: "We should consider that 'addiction' may be a convenient way to just say 'no,' and when this objection is obliterated, [Medco] will fall back on the question of cost."[11]

105.    Mark Alfonso, Purdue's vice-president of marketing, also weighed in: "My impression of this issues[sic] is that there are several major products . . . that are growing at a great rate and the MHC [managed health care] organizations are not slowing them. I also believe that a lot of what MHC AEs [Purdue's Managed Care Account Executives] hear from their accounts is with the intention of softening them up before the MHC asks for more aggressive rebates. They are told 'I am going to drop you from the formulary' for several months and then one day they are told 'If you give me higher rebate you can keep OxyContin in the forrrulary[sic].'"[12]

106.    Purdue executives clearly understood the significant threat that Medco's economic concerns posed to the continued success of OxyContin. They recognized that failing to address these concerns could result in the drug being excluded from formularies—an outcome that could jeopardize Purdue's business. Michael Friedman, then head of sales and marketing and later Purdue's CEO, underscored the urgency, stating: "If we do not [demonstrate the economic value of OxyContin], I can promise you that we will eventually be shut out . . . This is a serious matter that we cannot ignore and that we must discuss . . . We cannot continue to overlook the reality of [the PBMs'] economic proof requirements . . . If we are to stay in business, we need this proof of economic performance."[13]

---

[11] E513_00045035; PDD9316506319.

[12] E513_00006452.

[13] E513_00045035.

107.    Purdue recognized that it needed to broaden the market for OxyContin by persuading Medco and other PBMs of the drug's economic value in treating chronic non-cancer pain. This strategic shift aimed to counteract formulary pushback and secure continued access. As Purdue's medical director, Dr. Paul Goldenheim, wrote to Richard Sackler, "We have the tiger by the tail, and I wonder if we should add more muscle."[14] This statement reflected Purdue's growing awareness that it had unleashed a powerful—and potentially dangerous—product, and was now considering doubling down on its promotion despite rising concerns.

108.    Importantly, had Medco in 1997—as Purdue's largest customer at that time—excluded OxyContin from its formularies, restricted OxyContin use in non-cancer pain treatment, or even maintained its initial ceiling dose, it would have had a substantial impact on the success of OxyContin and would possibly have driven the drug off the market. Other major payors at that time, such as Cigna, had excluded OxyContin from their formularies.

109.    Medco, however, chose not to exclude or restrict OxyContin from its formularies. To the contrary, just three months after internal Purdue discussions about Medco's concerns, a May 1997 Purdue memo revealed that Medco had reversed course entirely and had "become very interested in 'partnering with Purdue'" on a range of initiatives aimed at expanding opioid use in the chronic pain market.[15] Rather than acting to limit OxyContin's reach, Medco embraced collaboration, helping to pave the way for its broader adoption.

110.    As a first step reflecting its new "partnership" with Purdue, Medco significantly raised its quantity limits on OxyContin. As discussed above, Medco initially implemented an 80 mg/day quantity limit at the release of OxyContin. Within five months of the drug's release and

---

[14] *Id.*
[15] PPLPC025000003668.

following further discussions with Purdue, Medco had doubled the quantity limit to 160 mg/day by May of 1996. By 2001, Medco had again doubled the quantity limit to 320 mg/day—four times the original limit set by Medco and more than five times the limit that Express Scripts now imposes on the drug as part of its Advance Opioid Program.[16]

111.    This covert collaboration threw open the floodgates, granting unfettered formulary access to opioids in exchange for lucrative rebates and fees—prioritizing profits over patient safety.

112.    Opioid manufacturers quickly recognized that Express Scripts was willing to provide unrestricted formulary placement for opioids on its standard closed formularies in exchange for higher rebates and other financial incentives. For example, in a candid February 15, 2000, email exchange, Purdue Managed Care Account Executive David Wallen explained that he could get Express Scripts "to steer [OxyContin] prescriptions" to retail pharmacies because of the substantial rebates it received.[17] According to Wallen, "Express Scripts makes their money from the rebate, so they cannot make any money on this account if they do not get rebates."[18]

113.    For almost every year since 2001, Express Scripts granted OxyContin preferred formulary placement in its standard, national formularies.

114.    Maintaining OxyContin's favorable formulary placement remained a priority for Express Scripts, even as it became obvious that some of their competitors had downgraded the drug due to rampant abuse and misuse. Internal Express Scripts documents show that by 2013, some within Express Scripts believed with respect to OxyContin that Express Scripts was "out of

---

[16] PPLPC012000064369, p. 7.

[17] PPLPC024000012498 (2/28/00).

[18] *Id.*

alignment with the rest of the PBM/Health Plans in . . . putting this drug on a preferred tier (and) that other organizations have leaned more towards taking a harder stance on this highly abused medication."[19]

115.    Internal Purdue notes state that "when Medco reviewed the drug spend for 2013, OxyContin was at the top of the list . . . OxyContin use at Medco is out of control compared with [the other large PBMs] . . . Patients are selecting Medco because Medco [has] OxyContin in a preferred position."[20]

116.    In 2014, Express Scripts reached out to Purdue requesting a higher rebate rate for OxyContin to maintain its preferred position. Purdue executives agreed given the importance of the Express Scripts relationship to OxyContin sales, stating: "ESI/Express Scripts/Medco -- commercial is 20-25% of our total OxyContin gross business, and the spillover effect of a negative move by ESI on OxyContin in 2015 cannot be underestimated . . . . Given the importance and impact of this customer on OxyContin sales . . . I *approve* [the decision to increase OxyContin rebate rates]."[21]

117.    Notably, at the same time in 2014 while Express Scripts was pressuring Purdue for increased rebates to keep OxyContin on its formularies—the company was simultaneously preparing press releases and marketing materials for its "Nation in Pain" report detailing how "[o]pioid abuse is an epidemic in the U.S."[22] While Express Scripts publicly positioned itself as a

---

[19] ESI_JEFFCOMO_000265250 (4/19/13).

[20] PPLPC012000373022.

[21] PPLPC012000475266, p. 2 (emphasis in original); PPLPC035000217128.

[22] A Nation in Pain: Focusing on U.S. Opioid Trends for Treatment of Short-Term and Longer-Term Pain, An Express Scripts Report," (Dec. 2014), https://cbsnet.cbservices.org/EBS/ebsparticipants.nsf/c7418b5485fb49438625765f0043afd8/06d e49a841c6757c8625874d004ad2ff/$FILE/A%20Nation%20In%20Pain.002.pdf/A%20Nation%2 0In%20Pain.pdf.

leader in the fight against the opioid crisis, claiming the report was intended to "highlight the power of Express Scripts' data and clinical expertise, and our commitment to identifying ways to make the use of prescription opiates safer and more effective[,]" it was privately securing millions of dollars in additional rebates from Purdue to maintain preferred formulary status for OxyContin.

118.    Despite its awareness of the escalating national opioid crisis—and the well-documented impact of preferred formulary placement—Express Scripts continued to list OxyContin on its most preferred brand formulary tier across nearly all of its standard formularies through at least 2017.

119.    To make matters worse, as the market shifted from branded opioids to generics in the mid-2000s, Express Scripts continued to grant generic opioids preferred, unrestricted placement on its standard formularies—not for clinical reasons, but because of the significant profits these drugs generated through spread pricing and other revenue streams. This preferential placement was a critical factor in enabling opioid manufacturers to expand utilization and grow the opioid market nationwide, including across West Virginia.

                  b.    Express Scripts and the Opioid Manufacturers Used Parity to Limit the Use of Utilization Management Measures for Prescription Opioids

120.    Express Scripts had powerful financial incentives to prioritize opioids over safer, often non-pharmacological, alternatives. Opioids generated outsized profits through mechanisms like rebates, fees, and spread pricing. While publicly asserting that UM tools were in place to ensure the safe and effective use of medications, Express Scripts was privately entering into confidential agreements with opioid manufacturers that deliberately undermined those very safeguards.

121.    Instead of implementing critical UM measures to limit the inappropriate prescribing of opioids, Express Scripts actively negotiated away those tools in exchange for financial gain.

Those UM tools, including prior approvals, step therapy, and dose limitations, could have dramatically curbed the overprescription, misuse, and diversion of opioids in West Virginia and nationwide. Yet Express Scripts agreed not to impose such restrictions, thereby ensuring opioids would remain broadly and easily accessible.

122.    Through these confidential negotiations, Express Scripts entered into rebate agreements with opioid manufacturers that contained "parity" and "no disadvantage" provisions— contractual commitments that guaranteed opioid products would not face formulary restrictions unless every competitor in the class was subject to the same limitations. In practice, these provisions ensured that opioids received equal, if not preferential treatment, compared to drugs without the same high risk of addiction.

123.    These "parity" and "no disadvantage" provisions had a predictable and devastating effect: they removed key barriers to overprescribing and opened the floodgates to opioid overuse. Express Scripts and opioid manufacturers shared a common purpose—to maximize the distribution of opioids with minimal oversight in service of mutual financial gain.

124.    These agreements were detailed and explicit. For example, Express Scripts' standard rebate agreements defined 'disadvantage' to include any restriction—such as prior authorization, NDC blocks, counter-detailing, co-pay differentials, or step edits—that would negatively impact the product's formulary status relative to other drugs within its designated competitive class.[23]

125.    Upon information and belief, Express Scripts and Purdue's 2002 contract included language stating Purdue would not pay rebates if its opioids were restricted. Likewise, in 2009,

---

[23] ESI_JEFFCOMO_000250248 (1/1/16).

Purdue would only pay rebates if its opioids were "unrestricted on the preferred brand tier."[24]
Again in 2014, Purdue would only pay rebates on OxyContin if it was on the "lowest preferred
brand tier, without restrictions, including no prior authorization or step therapy." Even as late as
2016, Express Scripts acknowledged that if it attempted to impose restrictions on OxyContin—
such as limiting use to acute pain, blocking prescriptions unless for cancer or other approved uses,
or requiring prior authorization—it would violate its rebate agreements with Purdue and would
result in a loss of rebates.

126.    Such arrangements existed with other opioid manufacturers. As another example,
upon information and belief, in 2010 during negotiations with Janssen regarding the fentanyl drug
Nucynta, for example, Express Scripts agreed not to impose step therapy or place Nucynta at a
disadvantage relative to other short-acting opioids.

127.    Likewise, a 2012 agreement between Express Scripts and Endo required that
Endo's opioids not be disadvantaged by UM tools unless those tools applied uniformly across all
branded drugs in the same competitive class.[25]

128.    These lockstep parity provisions effectively neutralized UM measures across the
entire opioids class. They ensured no single product would be singled out for oversight, and that
the market for prescription opioids would remain insulated from meaningful regulation. The rebate

---

[24] The terms of the agreements between opioid manufacturers and PBMs, including Express
Scripts, are considered extremely confidential by the PBMs and are not even disclosed to their
health plan clients. As a result, until key highly confidential documents were obtained in discovery
in *In re: National Prescription Opiate Litigation*, Case No. 1:17-md-2804-DAP (ND Ohio), and
other opioids litigation, there was little public insight into how these agreements affected the
volume of opioids flooding American households.

[25] ENDO-OPIOIDMDL-07228036 (4/22/10). P. 2.

agreements tied payment to this uniform, unrestricted access—prohibiting prior authorizations, step therapy, or other controls unless every competitive product faced identical treatment.

129.    The opioid manufacturers knew that UM presented a slippery slope—if more UM were employed, it would ultimately lead to the adoption of restrictions across the entire class of drugs. Indeed, this is precisely what happened. As summarized in a 2017 Express Scripts document, "Opioid management is currently a hot button issue. Express Scripts clients are demanding a solution as CMS and states implement requirements around appropriate opioid management (i.e. 3 states acted on prescriber 1st fill day supply restrictions; 12 additional states in process of implementing restrictions around morphine equivalent dose edits etc.) . . . We anticipate our opioid retail margin to be at risk over the next two to five years as states and federal government continue to intervene and prescribing practices change."[26]

2.    Express Scripts Misrepresented that It Was Using Formularies to Promote Safe Use and Appropriate Prescribing of Opioids

130.    Rather than offering transparency about its dealings with opioid manufacturers, Express Scripts concealed and falsely represented to clients, patients, and the public that its formulary designs were guided by a commitment to safe and appropriate opioid prescribing.

131.    For years, Express Scripts publicly held itself out as a champion of patient safety and healthcare improvement, claiming that its work promoted better health outcomes and safer prescription drug use. These representations were repeated in SEC filings, public reports, and media interviews, painting a picture of Express Scripts as responsible stewards of public health, for example:

- Express Scripts repeatedly stated in SEC filings that it worked with "clients, manufacturers, pharmacists, and physicians" to "improve members' health

---

[26] ESI_JEFFCOMO_000029922 (3/9/17).

outcomes and satisfaction," and that it was "making the use of prescription drugs safer and more affordable;"

- Medco similarly asserted that it leveraged its "clinical expertise and advanced information technology" to "improve safety and the quality of care," and that it developed "action-oriented clinical programs" based on sound medical rationale.

- In a 2013 interview, Express Scripts CIO Gary Wimberly highlighted the company's access to massive amounts of patient data—over 10 petabytes, generated from filling 1.4 billion prescriptions per year—stating that its team of researchers and scientists used this data to "interpret and analyze the data to identify opportunities to improve health outcomes."

132.    Yet, these assurances stood in stark contrast to Express Scripts' actual practices—profiting from rebates and fees paid by opioid manufacturers while granting unrestricted formulary access to dangerous drugs like OxyContin. Behind the scenes, Express Scripts prioritized revenue over safety, abandoning the very principles of clinical oversight and care it publicly claimed to uphold.

3.    For Over Two Decades—Even After Knowing The Dangers—Express Scripts Conspired With Opioid Manufacturers to Deceptively Market and Promote Opioids

133.    Opioid manufacturers launched a coordinated and well-funded campaign to redefine the way opioids were viewed and prescribed in West Virginia. Their goal was to expand the opioid market by convincing prescribers and the public that these highly addictive drugs were safe, effective, and appropriate for long term use.

134.    Express Scripts knew that there has never been reliable evidence demonstrating prescription opioids were safe or effective at treating chronic pain long term. Express Scripts further knew that prescription opioids carry serious risks of addiction, particularly when used long term to treat chronic pain. And yet, starting shortly after the release of OxyContin and continuing for years after the opioid epidemic extended throughout West Virginia, Express Scripts worked

with the prescription opioid manufacturers to spread misleading messaging about opioids as a class of drugs. In particular: (1) Express Scripts disseminated the opioid manufacturers' false, deceptive, or misleading messages about chronic pain and addiction to prescribers and patients, and (2) Express Scripts provided research, data, and consulting services to the opioid manufacturers to assist in expanding the opioid market.

135.    Their collaboration was extensive, for example, Express Scripts arranged for its pharmacists to be trained by Purdue—effectively turning pharmacists into conduits for Purdue's promotional messaging.

136.    Express Scripts and Purdue additionally launched so-called "educational programs", initiatives to help bypass formulary restrictions and promote OxyContin under the guise of scientific neutrality.

137.    In addition, Express Scripts (along with its subsidiaries – e.g., Express Scripts Specialty Distribution Service; Express Scripts SDS; HealthBridge, United BioSource LLC; Curascript, Inc.) partnered or collaborated with opioid manufacturers such as Purdue and Endo to create or sustain Patient Assistance Programs ("PAPs"), which provide free or low-cost medications to eligible individuals based on factors such as low-income and/or lack of health insurance. PAPs are "a triple boon for manufacturers" as they "increase demand, allow companies to charge higher prices, and provide public-relations benefits."[27]

138.    Upon information and belief, from the mid-1990s through 2017, Express Scripts and/or its subsidiaries partnered or collaborated with Purdue on its PAP, which is significant in three ways. First, as Purdue's partner mail order pharmacy, Express Scripts dispensed over 100

---

[27] Howard, David H., Drug Companies' Patient-Assistance Programs – Helping Patients or Profits? New    England    J.    Med,    97,    97-99    (2014),    available    at https://www.nejm.org/doi/pdf/10.1056/NEJMp1401658.

million opioid pills for Purdue's PAP. Second, beyond dispensing Purdue's drugs through the PAP, Express Scripts also administered the program. Express Scripts' administration of the program beginning in 2002 further establishes its collaboration with Purdue and Express Scripts' intentional role in the continuing, very successful marketing effort to increase utilization, volume, and downstream consumer access to OxyContin and other Purdue opioid products. Third, because of Express Scripts' integral involvement with Purdue's PAP, it was well aware of the addiction, abuse and diversion issues surrounding OxyContin and other prescription opioids.

139.    Even as public scrutiny mounted, Express Scripts deepened its involvement. In 2001, upon information and belief, it offered to assist Purdue with public relations efforts, including a mass mailing to 15,000 physicians enclosing brochures like *The Patient Bill of Rights for Pain Management*, which falsely claimed that addiction was rare when opioids were properly prescribed.[28]

140.    In addition to assisting the opioid manufacturers in spreading false information about opioids, Express Scripts provided the manufacturers with certain research and consulting services needed to expand the opioid market nationwide and in West Virginia.

141.    Express Scripts' involvement was not limited to consulting or research. It actively helped shape and deliver the opioid manufacturers' marketing narrative. Express Scripts participated in strategic planning calls with the opioid manufacturers to explore promotional initiatives, including internet coupons, preceptorships to influence clinical managers, and direct mail campaigns. One proposed mailing, drafted in collaboration with Purdue, aimed to "educate" physicians about OxyContin, using quotes and terminology that Purdue's own legal team had

---

[28] PPLPC028000031679.

forbidden its sales force from using—demonstrating a calculated effort to bypass internal compliance measures.

142.    Express Scripts' participation in the increasing opioid utilization and the misleading marketing of opioids continued even after Purdue pleaded guilty to criminal misbranding of OxyContin in 2007. Thus, even after Purdue acknowledged the falsity of its claims, Express Scripts continued to collaborate with opioid manufacturers to spread deceptive, false, and misleading misrepresentations about the safety and efficacy of opioids.

143.    Express Scripts' participation in the false and deceptive marketing of opioids continued long after their own data told them that the huge increases in opioid prescribing were creating a crisis of addiction, overdose, and death across the nation and in West Virginia.

144.    Express Scripts continued to engage in false, deceptive, and misleading marketing of opioids long after it knew or should have known of the falsity of the representations it disseminated.

4.    Express Scripts Had Access to Real-Time Data Regarding Drug Utilization Which Gave It a Unique Vantage Point into the Opioid Epidemic

145.    Express Scripts occupied a uniquely privileged position throughout the rise of the opioid epidemic throughout the nation and in West Virginia. With unmatched access to vast quantities of prescription data, it had a front-row seat to the surge in opioid prescribing and dispensing, monitoring its trajectory in real time. Its awareness was a direct result of the data it meticulously collected, the insights gleaned through its relationships with clients, drug manufacturers, and healthcare providers, and the clinical evaluations they conducted when making formulary placement decisions. At every step, Express Scripts was singularly positioned to grasp

the scope and escalation of the opioid crisis. And yet, it chose to continue participating in—and profiting from—its expansion.

146.    Express Scripts had the tools to detect red flags other entities could not. It knew when patients were "doctor shopping," obtaining opioids from multiple prescribers or filling prescriptions at numerous pharmacies. It tracked when patients repeatedly refilled high-risk prescriptions or received dangerous drug combinations—such as opioids, benzodiazepines, and sedatives—that significantly increased the risk of overdose. Express Scripts was also acutely aware when patients transitioned from opioid use to treatment for substance use disorder. Simply put, Express Scripts had an unparalleled, data-driven view of the opioid crisis as it unfolded, pill by pill, over the course of two decades.

147.    Express Scripts' data told a clear and alarming story: the volume of opioids being prescribed, both across the country and in West Virginia, far exceeded what could be medically justified. It knew opioids were being overprescribed and misused. It knew that states like West Virginia were being flooded with dangerously high quantities of these addictive drugs. Express Scripts had the knowledge, the foresight, and the capability to intervene. But it did not.

148.    Instead, it turned its data into profit. Express Scripts monetized the very insights that could have helped mitigate the crisis. It sold detailed claims data which enabled opioid manufacturers to identify which pharmacies and healthcare providers were prescribing and dispensing their opioids—and just as importantly, which ones were not. This intelligence allowed opioid manufacturers to deploy sales forces with laser precision, targeting high-volume prescribers and pharmacies, and fueling even greater market penetration of their opioids.

149.    Throughout this period, Express Scripts continued to aggregate, analyze, and profit from enormous volumes of prescription claims data that revealed unmistakable patterns of overuse,

36

abuse, and diversion. No entity in the pharmaceutical supply chain had more visibility into the crisis or a better opportunity to act. Express Scripts knew—or unquestionably should have known—that a public health disaster was unfolding in plain view. Despite its unique position and undeniable awareness, it chose not to intervene. Instead, Express Scripts continued to profit from the epidemic it had the power, and responsibility, to help stop.

      a.      Express Scripts Tracks Every Prescription Claim It Processes Across All The Health Plans It Services Which Provided It With Uniquely Granular And Comprehensive Data.

150.    Due to its business model, Express Scripts has long had access to an extraordinary volume of highly detailed data. Its role as a PBM gave it the ability to track and analyze information not only at the level of individual prescribers and pharmacies, but also across entire populations of manufacturers, patients, payors, and geographic regions. Its insight into opioid prescribing trends was both uniquely granular and broadly comprehensive.

151.    The data available to Express Scripts included key details such as the volume, dosage, and type of opioids being prescribed, the conditions for which they were being prescribed, the identity of the prescribers and pharmacies involved, and the geographic distribution of opioid dispensing. Express Scripts also had access to dispensing data from its own mail-order pharmacies, further enhancing its visibility into real-time trends in opioid utilization and potential abuse.

152.    Over the past two decades, Express Scripts alone has processed between 8 to 10 million prescription claims per day—amounting to approximately 1.4 billion claims annually— each with hundreds of data points. Since the 1990s, Express Scripts has possessed as much, if not more, detailed claims data related to opioid prescribing and utilization than any other entity in the pharmaceutical industry.

153.    Importantly, Express Scripts did not merely collect this data—it actively analyzed it. Express Scripts has published extensive drug utilization reports based on its claims data,

compiled from millions of its members nationwide. These *Drug Trend Reports*, published as early as 1999, demonstrated Express Scripts' awareness of the rising use of OxyContin and other opioids, as well as its understanding of the risks these drugs posed.

154.    That awareness was further evidenced by Express Scripts' own 2014 publication, *A Nation in Pain*,[29] which offered an in-depth analysis of the opioid epidemic based on 36 million pharmacy claims from 2009 to 2013. The report revealed Express Scripts' capability to track opioid use trends by geography, age, and gender, and to identify problematic behaviors such as doctor and pharmacy shopping and the concurrent use of dangerous drug combinations ("cocktails")—all of which are known indicators of abuse and addiction.

    b. Express Scripts Had Knowledge About The Opioid Epidemic And About Abuse And Diversion

155.    According to the United States Centers for Disease Control and Prevention ("CDC"), the escalation of opioid overdose deaths in the United States has occurred in three distinct waves. The first wave began in the 1990s, marked by a sharp increase in the prescribing of opioids and a corresponding rise in overdose deaths involving prescription opioids, including natural and semi-synthetic opioids and methadone, trends that began as early as 1993. The second wave emerged in 2010, characterized by a surge in overdose deaths linked to heroin use. The third wave began in 2013 and has been defined by a dramatic rise in fatalities involving synthetic opioids, particularly illicitly manufactured fentanyl. Together, these waves illustrate the evolving nature of the opioid crisis and underscore the role that overprescribing and pharmaceutical marketing played in fueling its earliest and most preventable stages.[30]

---

[29] *A Nation in Pain*, supra note 22.
[30] https://www.cdc.gov/overdose-prevention/about/understanding-the-opioid-overdose-epidemic.html.

156.    In September 2023, the United States entered what experts are now calling the *Fourth Wave* of the opioid epidemic. A study released by the Center for Social Medicine and Humanities at the University of California, Los Angeles, explains that this new phase is defined by a sharp rise in polysubstance overdose deaths—particularly those involving illicitly manufactured fentanyl combined with stimulants such as methamphetamine and cocaine.[31] By 2021, these two stimulants had emerged as the most common co-involved substances in overdose fatalities. This troubling development reflects a deadly evolution of the crisis—one that began with the overprescribing of prescription opioids and has now continued, expanded, and culminated in a widespread addiction and overdose epidemic fueled by increasingly potent and unpredictable drug combinations.[32]

157.    Long before the second wave of the opioid crisis began, Express Scripts was well aware that opioid abuse and misuse posed serious and growing dangers. It knew that opioids were highly addictive and carried a substantial risk of causing serious harm, including death—and it possessed this knowledge for at least two decades. Despite this awareness, it continued to support and profit from the widespread distribution of these drugs.

158.    For example, as early as 1997, Express Scripts raised concerns directly with Purdue about the potential for abuse associated with OxyContin. Those concerns only intensified in the early 2000s, when clients of Express Scripts began reporting growing alarm over the widespread abuse and diversion of the drug. Yet, rather than take meaningful steps to address these red flags, Express Scripts routinely turned to Purdue for help in managing the backlash. In response, Purdue

---

[31] Friedman, J, Shover, CL, Charting the fourth wave: Geographic, temporal, race/ethnicity and demographic trends in polysubstance fentanyl overdose deaths in the United States, 2010-2021, 118 ADDICTION 12 (Dec. 2023), https://onlinelibrary.wiley.com/doi/10.1111/add.16318.

[32] *Id.*

collaborated with Express Scripts to distribute research and so-called "educational" materials that minimized the risks of opioid use and falsely reassured stakeholders. These materials were used not to prevent harm, but to preserve market access and quiet concerns—ultimately enabling the continued overprescription, misuse, and devastation caused by opioids, even as the warning signs became increasingly impossible to ignore.

159.    Express Scripts also knew that opioids were being improperly marketed, particularly after Purdue pleaded guilty in 2007 to criminal misbranding of OxyContin. In the plea agreement, Purdue admitted to making specific false representations about the safety and efficacy of its product. Despite this public admission, Express Scripts was aware that Purdue, and other opioid manufacturers, continued to use the very same misrepresentations in ongoing marketing efforts. Yet, Express Scripts failed to take meaningful action to restrict access, correct misinformation, or protect patients—choosing instead to maintain the status quo and continue profiting from the sale of opioids.

160.    As early as 2008, on information and belief, Express Scripts acknowledged in internal documents the escalating risks of opioid diversion and abuse and growing demand in illicit markets.

161.    By 2009, Express Scripts was receiving urgent warnings from its clients concerning opioid abuse, including an email received from a client stating, "Houston, we have a problem and its name is Oxycontin."[33]

162.    In 2011, Express Scripts' own Vice President of Clinical Evaluation & Policy expressed serious concern about the unchecked overuse of opioids to the chair of one of Express

---

[33] Gross Dep. 55-56; see also Gross Dep. 74 (discussing exhibit in same time period where ESI clinical personnel observed that "there has been quite a bit of client buzz around increasing Oxycontin use")).

Scripts formulary committees, stating: "I think the overutilization of opiates continue to be a significant problem. From what I've heard, there are thoughts out there that the opiates are being greatly over-utilized by patients with chronic non-cancer pain . . . MDs should be pushing for more non-opiate pharmacotherapies and non-pharmacologic options."[34]

163.    In 2013, Express Scripts publicly acknowledged the scope of the crisis in a client-facing marketing poster. Drawing from internal and external data, the company declared that opioid abuse was now "deadlier than cocaine and heroin combined," while emphasizing Express Scripts' role in "collaborating to end the epidemic."

164.    Yet despite more than a decade of warnings, red flags, and clear evidence, Express Scripts failed to take meaningful corrective action. Rather than use its unique position to limit opioid misuse or implement effective controls, it chose to preserve relationships with manufacturers and maintain broad access to the very drugs it knew were driving a nationwide public health emergency.

165.    Express Scripts was therefore fully aware of the opioid epidemic not only through its own data but also through numerous other sources—one of the most direct being its internal Pharmacy & Therapeutics ("P&T") Committees. These committees are tasked with evaluating the clinical safety, efficacy, and cost-effectiveness of drugs for formulary placement and UM.[35] Typically composed of physicians, pharmacists, and other clinical experts, P&T committees meet regularly and are expected to stay current with peer-reviewed research, FDA guidance, and

---

[34] ESI_JEFFCOMO_000299137.

[35] Zhixiao Wang et al., "Cost-Effectiveness Analysis and the Formulary Decision- Making Process," Journal of Managed Care Pharmacy, Vol. 10, no. 1, pp 48-59 at p. 48 (Jan./Feb. 2004).

developments in clinical best practices.[36] Express Scripts itself describes its P&T Committee as "a panel of independent physicians and pharmacists in active clinical practice, representing a variety of specialties and practice settings and typically with major academic affiliations."[37]

166.    Best practices for P&T committee members, as outlined by institutions such as the University of Wisconsin–Madison's Division of Pharmacy Professional Development, emphasize the need to remain informed, objective, and focused on patient-centered outcomes.[38] These committees are expected to seek information from reputable sources—like scientific journals, FDA alerts, and clinical data—and to ensure that formulary decisions are guided by the documented safety and efficacy of each drug.[39]

167.    Given these expectations, P&T committee members for Express Scripts, knew, or at the very least should have known, of the well-documented risks associated with opioids throughout the relevant time period. Through its own internal review processes, Express Scripts was in a position to recognize the extent of the epidemic and take corrective action. Instead, it continued to approve and promote widespread access to opioids, despite mounting evidence of harm.

        c.      Express Scripts Failed to Timely Undertake Actions to Address the Opioid Epidemic that It Helped Create

---

[36] Peri Iz, "Study of Pharmaceutical Benefit Management," PricewaterhouseCoopers HCFA Contract No. 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/0097, p. 79 (June 2001).

[37] Express Scripts Holding Company, 2017 SEC Form 10-K, at p. 5 (Dec. 31, 2017) https://www.sec.gov/Archives/edgar/data/1532063/000153206318000004/esrx-12312017x10k.htm.

[38] UW-Madison School of Pharmacy, Division of Pharmacy Professional Development, 5 Best Practices for P&T Committee Members, (Sep. 25, 2023), https://ce.pharmacy.wisc.edu/blog/5-best-practices-for-pt-committee-members/.

[39] *Id.*

168.    Express Scripts was not only fully aware of the dangers posed by opioids—it also had the authority, the data, and the tools to curb opioid overprescribing, abuse, and diversion. Yet, it willfully chose not to act.

169.    With access to vast amounts of claims data, Express Scripts had the ability to detect opioid abuse and patterns of dangerous prescribing. Its systems captured detailed, individually identifiable information on patients, prescribers, and pharmacies—giving them a uniquely powerful vantage point to monitor and analyze opioid utilization trends. It also had access to widely available tools, including algorithms to flag high-risk prescribers and UM protocols designed to control patient drug use. Despite these capabilities, Express Scripts failed to implement timely opioid prescribing limits, failed to use its formulary and UM strategies to stem abuse, and failed to share the critical insights it gained from its data.

170.    These inactions occurred while Express Scripts was simultaneously contracting with opioid manufacturers and accepting significant rebates and fees directly tied to opioid utilization, without restrictions or safeguards in place. For decades, Express Scripts was on notice that prescription opioid overuse was fueling a national crisis. It had both the means and the responsibility to intervene but repeatedly chose not to, prioritizing profits at the expense of public health.

        i.      Express Scripts chose not to use its claims data or its UM offerings or formulary placement to address overprescribing, abuse, and diversion

171.    Express Scripts' own claims data and research confirmed the effectiveness of UM tools in reducing inappropriate opioid use. For example, in 2002, Express Scripts researchers examined the clinical and economic outcomes associated with implementing a prior authorization requirement for OxyContin. The results were clear: after the prior authorization policy was implemented, per-member-per-month claims and expenditures for OxyContin dropped

significantly, without a corresponding increase in overall pain-related treatment costs. The study also found that patients who obtained prior authorization approval were more likely to have a legitimate pain-related diagnosis, and there was no increase in pain-related health service usage between those approved and those not approved.

172.    In 2003, when describing how opioids were dispensed to Medicaid patients in the State of Georgia, an ESI employee noted how the deployment of a prior authorization process significantly curtailed OxyContin use in that state:

> Now for this particular program there was a special kind of PA [prior authorization] [for opioids] and it included quantity level limits. So what was happening in this PA was that a patient would call-in for the approval and at that time depending on their indication for short-term pain such as a fracture or long-term pain such as cancer, they would get the length of the amount of refills they get. So for the short term they would be allotted two one-month refills for the drug. For the long-term pain they would get up to six one-month refills for the drug. So . . . we looked at the outcomes and in this case we examined pain related emergency room visits. Now understandably this is not the best way to assess a pain outcome, but we had limited data, we had to do a retrospective analysis. If we had been able to do it prospectively we would have looked at things such as quality of life and activities of daily living.[40]

173.    The results of the Georgia Medicaid prior authorization program found that OxyContin dropped from the seventh to the fourteenth most expensive drug on the plan. More importantly, Express Scripts found that patients who did not receive OxyContin under the new restrictions did not experience an increase in other medical service usage, indicating that the program achieved cost savings and reduced opioid use without causing unintended medical consequences. Express Scripts acknowledged the success of the initiative, stating that any PBM

---

[40] PPLPC012000061348 (6/4/03).

should adopt these measures; specifically, "this [prior approval] program worked" and "this isn't just exclusive to [Express Scripts], but any PBM should be doing these things."[41]

174.    Again in 2006, Express Scripts conducted another study, this time focused on a Medicaid population—that once again demonstrated the effectiveness of prior authorization programs in reducing inappropriate OxyContin use. Express Scripts implemented a prior authorization policy that restricted OxyContin access to patients with a verified medical need, along with a quantity limit to prevent overuse. After one year, the results were clear: patients who successfully obtained prior authorization were significantly more likely to have a legitimate pain-related diagnosis than those who were denied at the pharmacy and did not pursue prior authorization approval. Importantly, Express Scripts also found that the program did not lead to increased use of emergency services for pain, demonstrating that access to appropriate care was maintained while inappropriate prescribing was reduced. Express Scripts concluded that the program effectively met the Medicaid agency's goal of promoting appropriate pain management while addressing concerns about misuse and abuse.[42]

175.    Despite knowing for decades that PA is a proven best practice for curbing opioid overutilization and abuse, Express Scripts failed to offer a standard PA protocol for opioids to its clients until 2017—and only after the U.S. Senate contacted the company *twice* to investigate its role in the opioid epidemic.

176.    Worse still, internal documents will show that Express Scripts had considered implementing such a program as early as 2007. That year, the company received specific requests for point-of-sale controls to address inappropriate narcotic utilization and noted that "a more robust

---

[41] *Id.*

[42] ESI_JEFFCOMO_000306081.

standard program covering all narcotics was desired."[43] Yet Express Scripts chose not to act, declining to pursue a program that could have prevented the widespread abuse of opioids within its system.

177.    Even in 2013, after the FDA removed the indication for long-acting opioids in the treatment of moderate pain, a significant move highlighting growing concerns about safety, Express Scripts admitted internally that it did not have a standard OxyContin prior authorization program. Instead, the company acknowledged that its existing UM strategies remained focused on promoting preferred products and controlling quantities, rather than addressing clinical appropriateness or patient safety.[44]

178.    Prior to 2017, whenever questioned by federal or state authorities, or even by its own clients, about what it was doing to combat opioid abuse, Express Scripts routinely pointed to its long-acting opioid ("LAO") step therapy policy. This policy merely required patients to try a generic version of an opioid before receiving a brand-name equivalent. However, Express Scripts was well aware that this policy was not designed to address opioid overuse or abuse.

179.    Express Scripts, however, knew its LAO step therapy policy did nothing to limit opioid misuse. Generic long-acting opioids are just as addictive as their brand-name counterparts, and shifting patients from branded to generic opioids did nothing to reduce harm. In fact, because many generic opioids were given Tier 1 status on Express Scripts' formularies, the policy effectively encouraged opioid use by making generics more accessible—further entrenching dangerous prescribing patterns. Express Scripts could have designed a step therapy program that required patients to try non-opioid treatments first.

---

[43] ESI_JEFFCOMO_000273099; ESI_JEFFCOMO_000273100, p. 4.

[44] ESI JEFFCOMO 000169781 (9/11/13).

180.    But Express Scripts failed to implement any such policy. It also failed to act during critical early years when brand opioids were rapidly expanding the pain treatment market and fueling abuse and diversion. Had Express Scripts created and offered a robust prior authorization or step therapy policy centered on non-opioid alternatives in the early 2000s, it could have significantly curtailed opioid prescribing. Instead, Express Scripts waited until 2017—after being contacted twice by the U.S. Senate—before even beginning to offer a standard prior authorization program for opioids. Had Express Scripts introduced a meaningful, system-wide prior authorization program for opioids as early as 2007, the impact could have been profound— potentially preventing tens, if not hundreds, of millions of opioid pills from being dispensed across the country, including in West Virginia. Instead, Express Scripts knowingly maintained weak controls, prioritized profits, and allowed the opioid crisis to deepen on its watch.

181.    The reason Express Scripts consistently resisted implementing opioid prescribing limits was because doing so might jeopardize Express Scripts' lucrative rebate arrangements with manufacturers.

182.    In short, despite knowing how to mitigate opioid misuse, Express Scripts allowed unfettered access to dangerous, highly addictive opioids on its standard formularies—with minimal, if any, clinical restrictions—in exchange for millions in manufacturer rebates and other financial incentives.

183.    Yet this did not stop them from publicly presenting themselves as leaders in the fight against the opioid crisis. On February 18, 2018, Snezana Mahon testified before the U.S. Senate Committee on Health, Education, Labor, and Pensions at a hearing titled *"The Opioid Crisis: The Role of Technology and Data in Preventing and Treating Addiction."* In her testimony, Mahon highlighted Express Scripts' powerful data capabilities, stating that the company had the

ability to "minimize early opioid exposure and prevent progression to overuse and abuse." She further testified: "[b]ecause Express Scripts interacts with patients, pharmacies, prescribers, and payers, our company is uniquely situated to collect data when patients receive and fill a prescription for an opioid under its pharmacy benefit. We can leverage that data across the care continuum in order to design interventions aimed at preventing opioid addiction from beginning in the first place."[45]

184.    This testimony, however, stood in sharp contrast to Express Scripts' internal practices. While publicly claiming to be a solution to the opioid epidemic, the company privately dismissed clinically sound policies that threatened its bottom line, choosing profits over patient safety at every critical juncture.

<blockquote>
ii.    Express Scripts chose not to use its "Drug Utilization Review" tools to address overprescribing, abuse and diversion
</blockquote>

185.    Compounding its failure to act, Express Scripts also chose not to use its "Drug Utilization Review" tools to address overprescribing, abuse and diversion.

186.    Express Scripts also had at its disposal a powerful tool to help control the flow of opioids: its Drug Utilization Review ("DUR") programs. Concurrent DUR ("Concurrent DUR" or "cDUR") is a critical safety mechanism that allows for the real-time evaluation of a patient's drug therapy at the point of sale. It is specifically designed to detect and prevent potential drug-related problems before a prescription is dispensed. These include therapeutic duplication, age- or gender-related contraindications, over- or under-utilization, drug-drug interactions, incorrect dosage or duration, drug-allergy risks, and signs of clinical abuse or misuse.

---

[45] Snezana Mahon, PharmD, The Opioid Crisis: The Role of Technology and Data in Preventing and Treating Addiction (February 27, 2018), https://www.help.senate.gov/imo/media/doc/Mahon.pdf.

187. Yet Express Scripts chose not to fully utilize DUR or cDUR to prevent inappropriate opioid prescribing.

188. For example, in 2013, the FDA removed the indication for use of long-acting narcotics to treat moderate pain, Express Scripts saw no reason to change its cDUR program, acknowledging that its strategy was "more focused on driving preferred products and managing quantities."[46]

189. Several years later, in 2016 when ESI tried to implement cDUR limits on Purdue's drugs, the manufacturer pushed back, reminding ESI that the cDUR limits (which would have restricted opioid use to acute pain, blocked opioids unless the use was for cancer or other approved uses, or required prior authorization for all opioids) would be in violation of its rebate agreement.

        iii.    Express Scripts failed to provide effective controls against diversion and/or to prevent the diversion and abuse of opioids

190. Upon information and belief, Express Scripts operated its PBM business and mail-order dispensing businesses through separate corporate entities. However, it was fully aware that prescription opioids posed serious risks of abuse and diversion, and that its mail-order pharmacies were legally obligated under West Virginia law and the federal Controlled Substances Act ("CSA") to maintain effective controls to prevent diversion.

191. Express Scripts also knew it possessed vast amounts of data capable of supporting those controls, along with a full suite of tools, including standard formularies, UM strategies, and drug utilization review programs, that could have significantly reduced the risk of diversion.

192. Even if the Express Scripts' entities that provide PBM services are not themselves subject to DEA oversight, those entities had parallel responsibilities to operate their PBM services

---

[46] ESI_JEFFCOMO_000169781 (9/11/13).

with appropriate care in light of the dangers of diversion that the CSA is designed to guard against. Any controls that Express Scripts Pharmacy, Inc.; ESI Mail Pharmacy, Inc. and Express Scripts Specialty Distribution Services, Inc. (all DEA registrants) provided (assuming there were any) could not be effective while its sister companies conducted their PBM activities so as to maximize the volume of opioid sales. Either way, Express Scripts had an obligation to operate its PBM business in such a way as to minimize or reduce the risks that these dangerous drugs would be diverted. All data available to Express Scripts was also available to its mail-order dispensing affiliates, and those entities had an obligation to use that data in maintaining effective controls against diversion, but they failed to do so.

5. Two Decades After It Knew Opioids Were Causing a Public Health Crisis, Express Scripts Finally Implemented Protocols to Address the Opioid Epidemic

193.    After decades of contributing to increased opioid utilization, Express Scripts finally launched programs aimed at addressing opioid overuse and abuse—but only in 2017, and only under mounting pressure from clients and federal authorities. Express Scripts' *Advanced Opioid Management* ("AOM") program was implemented on September 1, 2017.

194.    For years prior to taking meaningful action, Express Scripts publicly promoted its advanced data capabilities and its ability to develop targeted solutions to complex healthcare problems. In a 2013 *Forbes* article titled *"How Express Scripts Uses Analytics to Improve Patient Outcomes,"* Express Scripts Chief Information Officer Gary Wimberly proudly stated: "By filling 1.4 billion prescriptions per year, we have over 10 petabytes of useful data from which we can gain insights and for which we can develop solutions."[47]

---

[47] https://www.forbes.com/sites/peterhigh/2013/07/29/94-billion-express-scripts-leverages-technology-and-analytics-to-improve-patient-outcomes/.

195.    Despite this technological capacity and early awareness of the opioid crisis, Express Scripts waited until external pressure made inaction untenable, long after millions of Americans had already been affected by opioid addiction and overdose. Its delay underscores a consistent pattern: the failure to act until business interests or public scrutiny forced its hand.

196.    Yet, despite having access to petabytes of data for more than a decade, data that clearly revealed patterns of opioid overutilization, and despite publicly portraying itself for years as champions of public health, Express Scripts delayed meaningful action. Express Scripts did not launch its AOM program for plan sponsors until 2017. In other words, Express Scripts waited 17 years after it first became aware of the escalating prescription opioid crisis to act—and only did so after receiving an investigative inquiry from the U.S. Senate and following the CDC's declaration that opioid addiction can begin in as little as five days of use. This timeline reflects not a commitment to patient safety, but a reactive approach driven by political pressure and reputational risk.

### C.    The Express Scripts Mail Order Pharmacy Fueled the Opioid Epidemic By Dispensing Billions of Morphine Milligram Equivalents of Opioids

197.    Express Scripts played a further critical role in fueling the opioid crisis by operating some of the largest pharmacy networks in the country—networks that purchased, dispensed, and profited substantially from the distribution of opioids. In operating the Express Scripts Mail Order Pharmacy,[48] Express Scripts frequently acted as a direct dispenser of opioids, filling prescriptions itself.

---

[48] Express Scripts Pharmacy, Inc.; ESI Mail Order Processing, Inc.; and ESI Mail Pharmacy Service, Inc. are referred to herein collectively as the "Express Scripts Mail Order Pharmacy." *See* ¶56.

198.    Controlled substances, such as opioids, by definition, are highly subject to abuse and diversion. For this reason, West Virginia regulates every participant in the chain of distribution which handles controlled substances. To dispense prescription opioids in the State, companies must maintain effective controls against diversion.

199.    Congress has found that pharmacies share responsibility for the crisis: "The opioid epidemic . . . has arisen, in part, from the diversion of prescription opioids through illegal dispensing practices at pharmacies."[49]

200.    Express Scripts knowingly violated its duties under the West Virginia Controlled Substances Act ("WVCSA") and its implementing regulations, and the federal Controlled Substances Act ("CSA") and its implementing regulations.

1.    The Applicable Statutes

201.    Express Scripts was required to comply with the WVCSA and pharmacy regulations, including, but not limited to, the West Virginia Controlled Substances Act, W. Va. C.S.R. § 15-2-3 (previously W.Va. C.S.R. § 15-2-2), W. Va. C.S.R. § 15-2-4, W.Va. C.S.R. § 15-2-4.4, W.Va. C.S.R. § 15-2-4.5, W. Va. C.S.R. § 15-2-5.1.1 (previously W. Va. C.S.R. § 15-2-4.2.1), W. Va. C.S.R. § 15-2-5.3 (previously W.Va. C.S.R. § 15-2-4.4), W. Va. C.S.R. § 15-2-5 (previously W. Va. C.S.R. § 15-2-4), W.Va. Code § 60A-4-401(a), W. Va. Code § 60A-8-7(c)(1)(I); W. Va. Code § 60A-8-7(c)(3); and W. Va. Code § 60A-3-308(d)(l).

202.    The Rules of the West Virginia Board of Pharmacy for the West Virginia Uniform Controlled Substances Act are codified in W.Va. C.S.R. § 15-2-1, *et seq.*

---

[49] U.S. Senate Homeland Sec. & Governmental Aff. Comm., Ranking Member's Off., *Fueling an Epidemic: A Flood of 1.6 Billion Doses of Opioids into Missouri and the Need for Stronger DEA Enforcement,* at p. 4 (July 12, 2017), https://www.hsdl.org/c/abstract/?docid=812961.

203.    The West Virginia Uniform Controlled Substance Act requires "every person who manufactures, distributes, or dispenses any controlled substance within this state" to "obtain annually a registration issued by the state board of pharmacy." W. Va. Code § 60A-3-302(a); *see also* W.Va. C.S.R. § 15-2-4 (previously W.Va. C.S.R. § 15-2-3).

204.    Express Scripts was registered and had a duty to comply with federal, state, and local laws regarding the distribution of drugs. W. Va. Code § 60A-8-7(c)(1)(I); *see also* W. Va. Code § 60A-8-7(c)(3) (requiring compliance with guidelines adopted by the United States Food and Drug Administration).

205.    The West Virginia Board of Pharmacy has adopted, by reference, the requirements of the federal regulations, 21 CFR Parts 1300-1321, and 21 U.S.C. 801. *See* W. Va. C.S.R. § 15-2-3 (previously W. Va. C.S.R. § 15-2-2).

206.    West Virginia state law expressly imposes a duty upon Express Scripts to provide effective controls and procedures to guard against theft and diversion of controlled substances. W. Va. C.S.R. § 15-2-5.1.1 (previously W. Va. C.S.R. § 15-2-4.2.1).

207.    Express Scripts had a duty not to breach the standard of care established under West Virginia law and regulations and the federal CSA and its implementing regulations to provide effective controls and procedures to guard against theft and diversion of controlled substances. W. Va. C.S.R. § 15-2-5.1.1 (previously W. Va. C.S.R. § 15-2- 4.2.1).

208.    West Virginia state law further imposes a duty upon Express Scripts to design and operate a system to disclose to the registrant suspicious orders of controlled substances and inform the West Virginia Board of Pharmacy of suspicious orders when discovered "by providing a copy of the information which the wholesale drug distributor provides to the U.S. Drug Enforcement Administration regarding such suspicious orders." W. Va. C.S.R. § 15-2-5.3 (previously W.Va.

C.S.R. § 15-2-4.4). Suspicious orders include "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *Id.*

209.    Express Scripts had a duty not to breach the standard of care established under West Virginia law and regulations and the CSA and its implementing regulations to report suspicious prescribing and to maintain systems to detect and report such activity. W. Va. C.S.R. § 15-2-5 (previously W. Va. C.S.R. § 15-2-4); *See also* 21 U.S.C. §823; 21 C.F.R. 1301.74.

210.    The WVCSA further prohibits any person "[w]ho is subject to article 3 to distribute or dispense a controlled substance in violation of section [60A-3-]308." W. Va. Code § 60A-4-402(a)(l). Section 60A-3-308 of the WVCSA governs distribution of controlled substances, which is prohibited except by prescription. It provides, for example, that substances included in certain schedules of the law "shall not be distributed or dispensed other than for a medicinal purpose." W. Va. Code § 60A-3-308(d)(l).

211.    In addition to the requirement that Express Scripts comply with West Virginia controlled substances law and pharmacy regulations, Express Scripts was also required to comply with federal law including the CSA and its implementing regulations that govern the manufacture, distribution, and dispensation of controlled substances in the United States. The CSA accordingly establishes a closed regulatory system under which it is unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA.[50]

212.    The CSA and West Virginia law categorize controlled substances in five "Schedules."

---

[50] *See* 21 U.S.C. § 841(a).

213.     Schedule II (also called herein CII) contains drugs with "a high potential for abuse" that "may lead to severe psychological or physical dependence," but nonetheless have "a currently accepted medical use in treatment.[51]

214.     Schedule III contains drugs in which, although the abuse potential is less than a Schedule II drug, such abuse may lead to moderate "physical dependence or high psychological dependence." Schedule III drugs also have "a currently accepted medical use.[52]

215.     Schedule IV contains drugs that, although having a lower abuse potential than Schedule III drugs, still may lead to a physical or psychological dependence when abused.[53]

216.     Schedule V contains drugs that, although having a lower abuse potential than Schedule IV drugs, still may lead to a physical or psychological dependence when abused.[54]

217.     The CSA makes it "unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" except as specifically authorized.[55]

218.     Accordingly, the CSA requires those who manufacture, distribute, or dispense controlled substances to obtain a registration from the DEA.[56] A registrant is only permitted to dispense or distribute controlled substances "to the extent authorized by their registration and in conformity with the [CSA].[57]

---

[51] 21 U.S.C. § 812(b)(2); *see also* W. Va. Code. § 60A-2-205.

[52] 21 U.S.C. § 812(b)(3); *see also* W. Va. Code. § 60A-2-207.

[53] 21 U.S.C. § 812(b)(4); *see also* W. Va. Code. § 60A-2-209.

[54] 21 U.S.C. § 812(b)(5); *see also* W. Va. Code. § 60A-2-211.

[55] 21 U.S.C. § 841(a)(1).

[56] 21 U.S.C. § 822(a).

[57] 21 U.S.C. § 822(b).

219.    An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is an invalid prescription within the meaning and intent of the CSA.[58]

220.    At all times relevant to this Complaint, Express Scripts has registered its mail order pharmacies, Express Scripts Pharmacy, Inc.; ESI Mail Pharmacy, Inc. and Express Scripts Specialty Distribution Services, Inc., with the DEA in Schedule II–V controlled substances. Those DEA registrations authorize Express Scripts'-owned pharmacies to "dispense" controlled substances, which "means to deliver a controlled substance to an ultimate user . . . by, or pursuant to the lawful order of, a practitioner."[59]

221.    Agents and employees of a registered manufacturer, distributor, or dispenser of controlled substances, such as a pharmacist employed by a registered mail order pharmacy like those owned by Express Scripts, are not required to register with the DEA "if such agent or employee is acting in the usual course of his business or employment.[60]

222.    Under the CSA, the lawful dispensing of controlled substances is governed by 28 U.S.C. § 829 and more specifically in Part 1306 of the CSA's implementing regulations.[61]

223.    Unless dispensed directly by a non-pharmacist practitioner, no Schedule II controlled substance may be dispensed without the written prescription of a practitioner, such as a

---

[58] 21 U.S.C. § 829.

[59] 21 U.S.C. § 802(10), accord 21 U.S.C. § 823(f).

[60] *See generally* 21 C.F.R. § 1306.

[61] *See generally* 21 C.F.R. § 1306.

physician, except in an emergency.[62] Similarly, unless directly dispensed, no Schedule III or IV controlled substance may be dispensed without a written or oral prescription from a practitioner.[63]

224.    Such a prescription for a controlled substance may only be issued by an individual who is (a) "authorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession" and (b) registered with the DEA.[64]

225.    A prescription, whether written or oral, is legally valid under the CSA only if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.[65] Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment ... is not a prescription within the meaning and intent of [21 U.S.C. § 829] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."[66]

226.    As a result, the "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."[67] Thus, a pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose.

---

[62] 21 U.S.C. § 829(a).

[63] 21 U.S.C. § 829(b).

[64] 21 U.S.C. § 822; 21 C.F.R. § 1306.03.

[65] 21 C.F.R. § 1306.04(a).

[66] *Id.*

[67] *Id.*

227.    Moreover, "[a] prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice and either registered individually, or employed in a registered pharmacy . . . ."[68]

228.    Pharmacists are therefore permitted to dispense a controlled substance in any given instance if, but only if, such dispensing would be in accordance with a generally accepted, objective standard of practice—i.e., "the usual course of his [or her] professional practice" of pharmacy.[69]

229.    Consequently, a pharmacist is required to refuse to fill a prescription if he or she knows or has reason to know that the prescription was not written for a legitimate medical purpose.[70]

230.    Unlawful dispensing of controlled substances by a pharmacist may subject the pharmacy or pharmacist to criminal actions and to civil enforcement actions for money penalties or injunctions.[71]

231.    A pharmacy also needs to know there is a corresponding responsibility for the pharmacist who fills the prescription.[72] The pharmacist has a legal duty to recognize "red flags" or warning signs that raise (or should raise) a reasonable suspicion that a prescription for a controlled substance is not legitimate. The existence of such indicia obligates the pharmacist to conduct a

---

[68] 21 C.F.R. § 1306.06.

[69] *Id.*

[70] *See* 21 C.F.R. §§ 1306.04, 1306.06.

[71] 21 U.S.C. §§ 842, 843.

[72] United States Department of Justice, Drug Enforcement Administration Office of Diversion Control, Pharmacist's Manual: An Informational Outline of the Controlled Substances Act (Rev. 2020).

sufficient investigation to determine that the prescription is actually legitimate before dispensing. A pharmacist's corresponding responsibility extends to the pharmacy itself.

232.    A pharmacy cannot ignore red flags indicative of abuse and diversion. On the contrary, "a pharmacist is obligated to refuse to fill a prescription if he knows or has reason to know that the prescription was not written for a legitimate medical purpose."[73] "[W]hen prescriptions are clearly not issued for legitimate medical purposes, a pharmacist may not intentionally close his eyes and thereby avoid actual knowledge of the real purpose of the prescriptions.[74] Thus, § 1306.064 requires "pharmacists [to] use common sense and professional judgment," which includes paying attention to the "number of prescriptions issued, the number of dosage units prescribed, the duration and pattern of the alleged treatment," the number of doctors writing prescriptions and whether the drugs prescribed have a high rate of abuse or diversion.[75] "When [pharmacists'] suspicions are aroused as reasonable professionals," they must at least verify the prescription's propriety, and if not satisfied by the answer they must "refuse to dispense."[76]

---

[73] *Medic-Aid Pharmacy, Revocation of Registration*, 55 Fed. Reg. 30,043-01 (Dep't of Just. July 24, 1990).

[74] *East Main Street Pharmacy, Affirmance of Suspension Order*, 75 Fed. Reg. 66,149-01 (Dep't of Just. Oct. 27, 2010).

[75] *Ralph J. Bertolino, d/b/a Ralph J. Bertolino Pharmacy, Inc., Revocation of Registration*, 55 Fed. Reg. 4,729-01, 4,730 (Dep't of Just. Feb. 9, 1990).

[76] *Id.; see also Townwood Pharmacy, Revocation of Registration*, 63 Fed. Reg. 8,477-04 (Dep't of Justice Feb. 19, 1998); *Grider Drug No. 1 & Grider Drug No. 2, Decision & Order*, 77 Fed. Reg. 44,070-01 (Dep't of Justice July 26, 2012); *The Medicine Dropper, Revocation of Registration* 76 Fed. Reg. 20,039-01 (Dep't of Justice Apr. 11, 2011); *Medicine Shoppe-Jonesborough, Revocation of Registration*, 73 Fed. Reg. 364-01 (Dep't of Justice Jan. 2, 2008); *United Prescriptions Services, Inc., Revocation of Registration*, 72 Fed. Reg. 50,397-01, 50,407-8, (Dep't of Just. Aug. 31, 2007).

233.    Courts, too, have recognized the obligation of pharmacies not to dispense until red flags are resolved.[77] In *Medicine Shoppe-Jonesborough,* the Sixth Circuit affirmed a pharmacy's liability for filling false or fraudulent prescriptions for controlled substances, concluding that the pharmacy violated § 829 of the CSA and 21 C.F.R. § 1306.04. The Court held "[t]he CSA forbids a pharmacy to dispense a Schedule II, III, or IV controlled substance without a prescription, 21 U.S.C. § 829(a)-(b), which 'must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice,' 21 C.F.R. § 1306.04(a)."[78] Prescriptions that "involved excessive" quantities of drugs and "remedies outside the prescriber's ordinary area of practice" "should have raised red flags at Medicine Shoppe."[79] "By filling these prescriptions anyway. . . the pharmacy not only violated its duties under federal (and state) law to ensure that only proper prescriptions were filled but also put public health and safety at risk."[80]

234.    A pharmacy's registration can be revoked because its pharmacists have violated the corresponding responsibility rule and both the pharmacy and pharmacists may be the subject of further discipline.[81]

---

[77] *See Med. Med. Shoppe-Jonesborough v. Drug Enf't Admin.,* 300 F. App'x 409, 413–14 (6th Cir. 2008); *United States v. Henry,* 727 F.2d 1373, 1378–79 (5th Cir.), *on reh'g,* 749 F.2d 203 (5th Cir. 1984); *Holiday CVS, L.L.C. v. Holder,* 839 F. Supp. 2d 145, 160 (D.D.C.), *vacated and remanded,* 493 F. App'x 108 (D.C. Cir. 2012).

[78] *Med. Medicine Shoppe-Jonesborough,* 300 F. App'x at 412.

[79] *Id.* at 413

[80] *Id.*

[81] United States Department of Justice, Drug Enforcement Administration Office of Diversion Control, *Pharmacist's Manual: An Informational Outline of the Controlled Substances Act* (Rev. 2020) (citing *Jones Total Health Care Pharmacy, LLC v. Drug Enf't Admin.,* 881 F.3d 823 (11th Cir. 2018)).

235.    At all times material hereto, Express Scripts, as a DEA registrant, had the duty to "provide effective controls and procedures to guard against theft and diversion of controlled substances."[82]

236.    Federal and West Virginia laws and regulations require Express Scripts to act as gatekeepers guarding against the diversion of the highly addictive, dangerous opioid drugs. *See* 21 U.S.C. § 823; 21 C.F.R. 1301.74; W. Va. C.S.R. § 15-2-5 (previously W. Va. C.S.R. § 15- 2-4).

237.    Express Scripts failed to meet its duties and obligations under West Virginia and federal law.

2.    Express Scripts Violated West Virginia Law and the Federal Controlled Substances Act

238.    The framework of state and federal statutes and regulations, along with industry guidelines, make clear that pharmacies like those Express Scripts own are expected to use specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription narcotics and of the risks and dangers of the abuse and diversion of prescription narcotics when dispensing of medications outside the usual course of professional practice.

239.    Express Scripts was on notice that case law and administrative proceedings interpreting the CSA clearly required that its pharmacies must recognize and resolve all "red flags" indicating addiction, abuse and diversion, such as criminal, civil, or administrative actions pending against the prescriber, pattern prescribing, pharmacy shopping, doctor shipping, high abuse potential prescriptions, drug cocktails, etc.[83]

---

[82] 21 C.F.R. § 1301.71(a); *see also*, W. Va. C.S.R. § 15-2-5.1.1 (previously W. Va. C.S.R. § 15-2-4.2.1).

[83] *Holiday v. Holder,* 839 F. Supp. 2d 145; *Pharmacy Drs. Enterprises, Inc. v. Drug Enf't Admin.,* 789 F. App'x 724, 730 (11th Cir. 2019); *Holiday CVS,* 77 Fed. Reg. at 62,318, 62,326, 62,331,

240.    It is not just the single red flags that make the suspicious prescriptions unresolvable, but frequently the fact that there are multiple red flags at one time. So, rather than just looking for unresolvable single red flags, Express Scripts should have been looking for instances when there are multiple red flags in combination, which would make these truly unresolvable.

241.    At all times material hereto, Express Scripts has been in the position to recognize those red flags listed above. Upon information and belief, all or some of those red flags were frequently present in hundreds of thousands of prescriptions its pharmacies received during the relevant time and should have caused Express Scripts' mail order pharmacies to refuse to fill prescriptions and/or report the behavior. However, Express Scripts failed to do so.

242.    Express Scripts, as a sophisticated owner of multiple mail order pharmacies, had the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores in diverse geographic locations. Express Scripts tracks every prescription claim it processes across all the health plans it services. Furthermore, Express Scripts could aggregate the data across various entities in the pharmaceutical supply chain, including drug manufacturer, pharmacies, insurers, and patients. Its own data would have allowed Express Scripts to observe patterns or instances of dispensing that are potentially suspicious of diversion or oversupply in particular stores or geographic areas, and of prescribers or facilities that seem to engage in improper prescribing.

---

62,344; *East Main Street Pharmacy,* 75 Fed. Reg. at 66,159; *Oak Hill Hometown Pharmacy v. Dhillon,* 418 F. Supp. 3d 124, 131 (S.D.W. Va. 2019); *Jones Total Health Care Pharmacy, LLC,* 881 F.3d at 828; "Centers for Disease Control, CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016," 65 Morb. And Mort. Wkly Rep. (Mar. 18, 2016) https://www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6501e1.pdf.

243.    Rather than use its data to limit problematic opioid utilization or investigate outlier prescribers, Express Scripts sold the data to third-party vendors who in turn resold the data to drug makers like Purdue Pharmaceuticals. Drug makers used these data to stoke increased sales of opioid drugs to physicians throughout West Virginia.

244.    Yet, Express Scripts did little to leverage its resources and troves of information to stop or further question the wildly inappropriate prescriptions being written by prescribers until well after the opioid epidemic had reached its peak.

245.    Express Scripts did little to fulfill its duties as the last line of defense and failed to ensure that the prescriptions it was filling were issued to legitimate patients for legitimate medical purposes by practitioners acting in the usual course of professional practice, as is evident by the copious amounts of opioids being dispensed by Express Scripts' mail order pharmacies throughout West Virginia and this Judicial District.

246.    The absence of controls against diversion is not surprising, given how Express Scripts' Mail Order Pharmacy operated to push virtually all prescriptions out the door, with little or no attempts at identifying or resolving red flags. The pressure on its pharmacists to fill large volumes of prescription made the performance of appropriate due diligence difficult, if not impossible.

247.    Despite its legal obligations as licensees and registrants under West Virginia law, Express Scripts, through its operation of the Express Scripts Mail Order Pharmacy, knowingly allowed widespread diversion to occur.

248.    The Express Scripts Mail Order Pharmacy dispensed, sold, and shipped far greater quantities of prescription opioids throughout West Virginia than it knew could be necessary for legitimate medical uses.

249.    This included shipping opioids to patients of high-volume prescribers targeted by Purdue's opioid marketing campaign, knowingly or recklessly fulfilling illegitimate prescriptions.

250.    As a direct result of its conduct, West Virginia has experienced and continues to experience both a flood of prescription opioids available for illicit use or sale and a population of patients with physical or psychological dependence on opioids.

251.    The Express Scripts Mail Order Pharmacy was subject to DEA regulatory action for its failures to implement appropriate controls on dispensing. For instance, on May 15, 2012, Express Scripts Pharmacy Services, Inc. agreed to pay the United States $2.75 million to resolve allegations under the Controlled Substances Act. Express Scripts experienced theft by employees of controlled substances, had inventory discrepancies, and failed to report in-transit losses to the DEA. According to the DOJ press release, from 2004 through 2009, Express Scripts employees utilized invalid DEA numbers in Express Scripts' computerized prescription processing system in order to process certain controlled substances prescriptions at all of its mail order facilities.

252.    As part of the settlement, Express Scripts was required to develop a comprehensive Controlled Substances Security Compliance Plan that included diversion protection measures far beyond those required by law, including improved physical security, enhanced inventories, reconciliations and audits, employee background checks, and mandatory training for employees who have contact with controlled substances. Express Scripts executives, including the General Manager of Pharmacy Operations and the Chief Compliance Officer, were required to certify compliance with the terms of the Plan. In addition to the measures to protect against diversion of controlled substances, Express Scripts was also required to cease use of phony DEA numbers and agreed to set up an automated system to check the validity of prescribers' DEA and NPI (National Provider Identifier) numbers against a national registry.

253.    According to data from the DEA's Automated Reports and Consolidated Ordering System ("ARCOS"), between 2006 and 2014, the Express Scripts Mail Order Pharmacy purchased and dispensed more than 22.9 billion Morphine Milligram Equivalents ("MMEs") across approximately 1.1 billion opioid dosage units. These opioids were distributed by mail to patients nationwide, including in West Virginia—the widely recognized epicenter of the opioid overdose epidemic.[84]

254.    The Attorney General's claims are grounded in Express Scripts' breaches of statutory and regulatory duties, including its failure to implement effective dispensing policies and procedures, failure to analyze and act upon the vast data it possessed regarding prescription trends, and failure to adequately train staff on compliance with West Virginia law.

255.    Each time Express Scripts' Mail Order Pharmacy filled a controlled substance prescription without identifying and resolving red flags, it violated the CSA and West Virginia law. These prescriptions were often dispensed outside the usual course of professional practice and not for legitimate medical purposes. In doing so, Express Scripts knowingly and intentionally facilitated the unlawful distribution of controlled substances in violation of the West Virginia Controlled Substances Act and related state regulations.

256.    In sum, the Express Scripts Mail Order Pharmacy did nothing to fulfill its duties as the last line of defense and failed to ensure that the prescriptions it was filling were issued to legitimate patients for professionally recognized therapeutic purposes (legitimate medical purposes under federal law) by practitioners acting in the usual course of professional practice, as is evident by the copious amounts of opioids being dispensed throughout West Virginia.

---

[84] Wood, N., et al., *Enhancing and Leveraging the West Virginia's Prescription Drug Monitoring Program for Public Health Surveillance and Clinical Decision Making: A Case Study*, Journal of Public Health Management & Practice, E37-E43 (March/April 2023).

257.    Express Scripts violated the CSA, West Virginia controlled substances laws and state and federal pharmacy laws and regulations by dispensing controlled substances in violation of their corresponding responsibility under 21 C.F.R. § 1306.04(a) and outside the usual course of pharmacy practice under 21 C.F.R. § 1306.06.

258.    Express Scripts violated the CSA, West Virginia controlled substances laws and state and federal pharmacy laws and regulations each time their mail order pharmacies filled a controlled substance prescription without identifying and resolving those red flags because, *inter alia*:

- They were knowingly filled outside the usual course of professional practice and not for a legitimate medical purpose; therefore, they were not pursuant to a valid prescription under 21 U.S.C. 829 and thereby violated 21 U.S.C. § 842(a)(1); and

- They were knowingly and intentionally dispensed outside the usual course of professional pharmacy practice in violation of 21 C.F.R. 1306.06, and therefore such dispensing and delivering of controlled substances was not authorized by the CSA, and thereby violation 21 U.S.C. § 841(a).

259.    The opioid crisis alleged herein is a direct and foreseeable result of Express Scripts' actions and inactions. And it was reasonably foreseeable that the State would be damaged thereby.

260.    The opioid nuisance alleged herein is a direct and foreseeable result of Express Scripts' actions and inactions. And it was foreseeable that the State would be damaged thereby.

261.    Express Scripts failed to maintain effective controls against abuse and diversion or conduct adequate due diligence to ensure opioids were not diverted, resulting in the gross over-

dispensing of opioids. Express Scripts thus directly contributed to today's opioid epidemic and corresponding harm to the State.

### D.    Facts Pertaining to the Formulary & UM Enterprise

262.    Express Scripts, the Express Scripts Mail Order Pharmacy, and each of the opioid manufacturers (including Allergan plc, Johnson & Johnson/Janssen, Endo Health Solutions Inc., Insys Therapeutics, Mallinckrodt Pharmaceuticals, Purdue Pharma, and Teva Pharmaceuticals /Cephalon Inc., referred to collectively as the "Opioid Enterprise Manufacturers" for the purposes of this Section) formed an association in fact enterprise, the "Formulary & UM Enterprise."

263.    The Formulary & UM Enterprise was characterized by a common purpose, relationships among members of the Formulary & UM Enterprise, and sufficient longevity to accomplish the common purpose thereof. Express Scripts conducted and participated in the conduct of the Formulary & UM Enterprise through a pattern of racketeering activity.

264.    Each member of the Formulary & UM Enterprise knew that prescription opioids were highly addictive, ineffective, and unsafe for the treatment of long-term chronic pain, non-acute pain, and non-cancer pain. Each member of the Formulary & UM Enterprise was also aware that use of prescription opioids carried risks such as addiction, opioid use disorder, overdose, and death. Nevertheless, each member of the Formulary & UM Enterprise joined together into an association-in-fact enterprise for the common purpose of profiting from an expansion of the market for prescription opioids, and increased prescribing, dispensing, and sales of those drugs.

265.    Each member of the Formulary & UM Enterprise sought to fulfill a common purpose through a pattern of mail and wire fraud, and corrupt manufacture, receiving, concealment, buying, selling or otherwise dealing in controlled substances. Specifically, each member of the Formulary & UM Enterprise supported each other member in perpetrating a scheme on the consumers who received prescriptions for opioids and on Express Scripts' clients. Each member

of the Formulary & UM Enterprise also supported each other member in possessing and dispensing controlled substances in Schedules II through IV in manners that were not authorized by the federal Controlled Substances Act and West Virginia Controlled Substances Act.

266.    For their part, the Opioid Enterprise Manufacturers' illegal marketing and false statements regarding prescription opioids have been well documented. They knew that prescription opioids were dangerous and addictive and, nevertheless, marketed them as safe and non-addictive. These representations furthered the common purpose of the Formulary & UM Enterprise.

267.    Express Scripts, for its part, made representations alleged, *see generally supra*, that its business was committed to making decisions about its formulary and UM offerings that were driven by a commitment to the health and safety of its covered lives and was focused on delivering safe healthcare.

268.    Express Scripts and opioid manufacturers also knew that the Express Scripts Mail Order Pharmacy received prescriptions that were not for lawful orders of a practitioner. Moreover, Express Scripts and opioid manufacturers knew that the Express Scripts Mail Order Pharmacy was filling illegitimate prescriptions.

269.    By these strategies both Express Scripts and the Opioid Enterprise Manufacturers agreed to further the common purpose of the Formulary & UM Enterprise through a scheme and unlawful possession and dispensing of controlled substances, and to grow the market for prescription opioids by increasing prescribing, dispensing, and sales of prescription opioids.

270.    As an example, the Opioid Enterprise Manufacturers contracted and agreed with Express Scripts to coordinate unfettered formulary placement with no or limited UM measures regarding each opioid drug on Express Scripts' standard formulary offerings, such that there would be as little impediment as possible to opioid prescribing and dispensing. From their agreements,

each member of the Formulary & UM Enterprise stood to reap significant profits from ever-increasing prescribing, dispensing, and sale of prescription opioids: the Opioid Enterprise Manufacturers from sales of their drugs and Express Scripts from rebates and other fees. As part of these agreements, Express Scripts gave each of the Opioid Enterprise Manufacturers parity terms, ensuring that no Opioid Enterprise Manufacturer's opioid was disadvantaged within each class of opioid analgesics, and provided the Opioid Enterprise Manufacturers with data about the lives that it managed, the prescriptions written by doctors on its plans, and assistance with pull through contracts to assist them in pulling through the formulary decisions which would continue to increase prescribing and sales.

271.    These contracts, and further information described below, evidence an agreement between Express Scripts, the Express Scripts Mail Order Pharmacy, and the Opioid Enterprise Manufacturers. Express Scripts and each Opioid Enterprise Manufacturer understood that Express Scripts was going to operate on a fundamentally misleading basis. As alleged more fully herein, Express Scripts promised its clients that it would take actions that would ensure that opioid prescribing and dispensing were safe and cost effective. Express Scripts also represented to legislative bodies and the public that its conduct was intended to maximize health, safety, and cost-effective healthcare for its covered lives. Express Scripts, however, had agreed with the Opioid Enterprise Manufacturers that its conduct would have the opposite effect: the Formulary & UM Enterprise and its members intended to obtain money and property from the prescribing, dispensing, and sale of prescription opioids that they would not otherwise have received had they been honest and conducted their businesses along the lines of their public representations.

272.    Express Scripts worked with each Opioid Enterprise Manufacturers in negotiations that were intended to maximize the amount of profit for Express Scripts and the Opioid Enterprise

Manufacturers. Discussions of formulary status and prior authorization, for example, were always a vehicle for discussions about the amount of rebates and administrative fees. As the Opioid Enterprise Manufacturers and Express Scripts knew and intended, the end result was always the same—agreements for favorable formulary status without UM so that prescribing, dispensing, and sales could continue to increase.

273.    Purported competition among the Opioid Enterprise Manufacturers for increasing market share of their drug against a competitor's drug did not undercut the common purpose of the Formulary & UM Enterprise. For example, Purdue's competition with Endo for market share of OxyContin over Opana did not slow or decrease the prescribing, dispensing, or sale of prescription opioids as a class of drugs. Furthermore, each member of the Formulary & UM Enterprise knew that there would be competition in the market, but each member also knew that their participation in the Formulary & UM Enterprise was necessary to continue growing the market and agreed to work together towards that goal.

274.    As alleged more fully herein, the Formulary & UM Enterprise caused direct injury to West Virginia's money and property.

1.    Formation of the Formulary & UM Enterprise

275.    The Formulary & UM Enterprise was formed primarily in two ways, including: the forced dealing of the members with each other in the closed system of controlled substance manufacture, distribution, and dispensing, as well as the members' work together in trade associations and industry working groups like the Pharmaceutical Care Management Association ("PCMA").

276.    First, the formation of the Formulary & UM Enterprise occurred, in part, through the parties' dealings with each other required by the closed system imposed by the CSA. The pharmaceutical industry is extremely insular and part of a "closed system" open only to those who

register to do so. Other than its CSA obligations for mail order pharmacies, Express Scripts is one of the very few participants in the chain of controlled substance distribution and dispensing that is not required to register with the DEA. However, in its efforts to secure cost-effective access to controlled substances on behalf of its clients, Express Scripts was forced to work closely with the Opioid Enterprise Manufacturers.

277.    Over at least the last two decades, the consolidation and acquisition of pharmacy benefit management companies into ever-larger entities has led to the formation of close personal business relationships between the few remaining PBMs and the Opioid Enterprise Manufacturers that were based on a shared interest in and the common purpose of ensuring the widespread dispensing of opioids.

278.    There can be no doubt that Express Scripts and the Opioid Enterprise Manufacturers have maintained close relationships. As business entities, they have been negotiating with each other since the mid-1990s over rebate agreements, contract amendments, re-negotiations, payment discussions, and rebate invoicing. These negotiations often involved high level executives at both companies, and a multitude of emails and phone calls, including personal calls between executives, to iron out details. The contractual dealings between the Opioid Enterprise Manufacturers and Express Scripts created relationships and provided context in which the common purpose of the Formulary & UM Enterprise could develop. These contract negotiations were always geared towards maximizing the number of prescriptions written for Express Scripts' clients and ensuring the most optimal formulary placement and least amount of UM under Express Scripts' standard offerings so that the prescribing, dispensing, and sales could continue to grow.

279.    The earliest indications of the existence of the Formulary & UM Enterprise can be found in Express Scripts' negotiations with Purdue, their work together on disseminating the Opioid Enterprise Manufacturers' marketing messages about prescription opioids, the presence of Purdue-paid speakers at Express Scripts' offices, and Express Scripts' research work supporting the Opioid Enterprise Manufacturers. Although the earliest indications of the Formulary & UM Enterprise's existence begin with Purdue and the predecessors of Express Scripts, the allegations above indicate that the Formulary & UM Enterprise grew to include all of the Opioid Enterprise Manufacturers and Express Scripts.

280.    The Formulary & UM Enterprise found its beginnings with Purdue-sponsored doctors speaking at Express Scripts' offices, in the late 1990s, all across the country, and rebate contract negotiations between the Opioid Enterprise Manufacturers and Express Scripts and/or its predecessor companies that began around the same time and have continued through the present.

281.    The formation of the Formulary & UM Enterprise did not happen solely within the formation of the rebate contracts between the Opioid Enterprise Manufacturers and Express Scripts. The Formulary & UM Enterprise also continued to develop through regular non-contractual interactions, including through the use of the U.S. Mail or interstate wire facilities in furtherance of the scheme, including: (1) interactions about the administration of the rebate contracts; (2) pull-through marketing and assistance therewith; and (3) joint participation in trade associations and informal coalitions.

282.    Trade associations, informal coalitions, and forums not only provide a basis for the formation of the Formulary & UM Enterprise, but also serve as central conduits for the conduct of and participation in the Formulary & UM Enterprise. The prime example of a trade association

through which the Formulary & UM Enterprise developed and operated is the PBM trade association, the Pharmaceutical Care Management Association ("PCMA").

283.    PCMA describes itself as "lead[ing] the effort in promoting PBMs and the proven tools they utilize, which are recognized by consumers, employers, policymakers, and others as key drivers in lowering prescription drug costs and increasing access."[85]

284.    While PCMA boasts of being the national association representing America's pharmacy benefit managers, it actually has a much broader membership base and focus. As evident from the PCMA website, PCMA membership includes member PBMs and so-called "Affiliate" drug manufacturers and other entities, including numerous Opioid Enterprise Manufacturers as current or former members.

285.    As repeatedly mentioned in the PCMA's annual conference materials, the drug manufacturers are the PBMs' most notable business partners.

286.    Express Scripts is a member of PCMA, and due to the leadership positions, it has exercised substantial control over that organization.

287.    Indeed, PCMA has and continues to be governed by PBM executives. Adam Kautzner, President of Express Scripts, has and/or continues to serve on the PCMA's Board of Directors and previously served as the Board's Chair. Adam Kautzner succeeded the previous Chair, David Joyner, who at the time was Executive Vice President of CVS Health and President of CVS Caremark (another PBM with substantial national market share comparable to Express Scripts). After Mr. Kautzner, Mostafa Kamal, President and Chief Executive of Prime Therapeutics LLC (another national PBM), assumed the role of the Chair.

288.    An image illustrating the membership in the PCMA is as follows:

---

[85] https://www.pcmanet.org/about/.



289. Active control over the PCMA Board of Directors is important to Express Scripts and clearly conditioned on current employment by the PBM. As an example, in 2022, former Express Scripts President Amy Bricker was the former Chair of the PCMA Board of Directors and the only Express Scripts employee on the Board. But, when Ms. Bricker left Express Scripts in late 2022/early 2023, she was removed from the PCMA Board. On February 3, 2023, PCMA issued a press release, naming Mr. Kautzner to the Board and as its Chair.

290. Each year during the relevant period, PCMA has regularly held industry conferences, including its Annual Meeting and Business Forum conferences.

291. Every year, high-level representatives and corporate officers from both Express Scripts and the Opioid Enterprise Manufacturers have attended these conferences to meet in person and engage in discussions, including those in furtherance of the Formulary & UM Enterprise.

292. In fact, many of the Opioid Enterprise Manufacturers have been "Partners," "Platinum Sponsors," or "Presidential Sponsors" of these PCMA conferences.

293.    Notably, many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications. For example, as Presidential Sponsors of these conferences, the Opioid Enterprise Manufacturers were permitted to host "private meeting rooms" that offer "excellent opportunities for interactions between PBM members, drug manufacturers, and other industry partners."

294.    Representatives from Express Scripts and the Opioid Enterprise Manufacturers have routinely met during the Annual Meetings and Business Forum conferences that PCMA holds (and the manufacturers sponsor) each year.

295.    In addition, all PCMA members, including Affiliates and registered attendees of these conferences are invited to join PCMA-Connect, "an invitation-only LinkedIn Group and online networking community."

296.    As PCMA members and Affiliates, Express Scripts, and the Opioid Enterprise Manufacturers utilized both PCMA-Connect, as well as the meetings facilitated by PCMA (including at conferences), to exchange information and to reach agreements in furtherance of the Formulary & UM Enterprise.

297.    Thus, PCMA served as a conduit of information between the Opioid Enterprise Manufacturers and Express Scripts on subjects like access to prescription opioids and facilitated the sharing of information and collaborative partnerships.

298.    PCMA hosts regular meetings during which PBMs and Opioid Enterprise Manufacturers, or "Pharma" as they are called by the PBMs, can discuss their coordinated and shared objectives/strategies. PCMA's website posts programs for its regular meetings that highlight the close collaboration and partnership between the PBMs and the Opioid Enterprise Manufacturers.

299.    For example, in describing its 2021 annual meeting in Colorado Springs, Colorado, the PCMA stated on its website that "[t]he event [was] tailored specifically for senior executives from PBMs and their affiliated business partners – most notable drug manufacturers." The description further emphasized that the annual meeting was "an important part of [a PBM's] business strategy."[86]

300.    On information and belief, program agendas at PCMA's regular meetings often included topics that focused on strengthening the business relationships between PBMs and manufacturers.

301.    Given the foregoing, it is not surprising that Purdue viewed PCMA as a valuable source of information and coordination on subjects regarding prescription opioids and OxyContin. As examples, Purdue employees were notified about meetings at the PCMA conference in 2001 that discussed "oxy attacks as a predatory action on the part of the media or one of your competitors," and Burt Rosen (another Purdue employee) reached out to PCMA in 2014 to find the right person to connect with "on opioids."[87]

302.    More broadly, PCMA (including through the regular use of the U.S. Mail or interstate wire facilities in furtherance of the scheme) served as a clearinghouse for communication, discussion, consensus building and speaking on behalf of Express Scripts and the Opioid Enterprise Manufacturers who were Affiliate members. Documents confirm that PCMA was a conduit through which discussions occurred and consensus could be reached and that

---

[86] https://www.pcmanet.org/events/past-events/pcma-annual-meeting-2021/.

[87] PDD8801103934 (3/16/01); PPLPC018001107944 (10/2/14).

specific discussions and work took place around efforts to curb opioid abuse (which would have worked against the common purpose of the Formulary & UM Enterprise).

303.    PCMA was not the only way in which Express Scripts and the Opioid Enterprise Manufacturers collaborated. For example, the Controlled Substances Stakeholder's Coalition was formed in October 2013 in order to "further collaborate on interprofessional efforts to combat the United States opioid epidemic." At the time of the Coalition meeting in December 2016, these meetings had been ongoing for at least three years with each organization providing "updates for increasing awareness and decreasing misuse and diversion."[88]

304.    Express Scripts claimed that it was making recommendations to physicians that had substantially decreased opioid prescriptions and taking actions to increase depository sites for drug disposal. As alleged more fully herein, however, Express Scripts was at the same time, in order to protect its share of rebates and other fees, actively working with the Opioid Enterprise Manufacturers in the Formulary & UM Enterprise to avoid taking actions that would have reduced prescribing, thus ignoring its obligations to reduce unsafe and inappropriate prescribing.

305.    Members of the Formulary & UM Enterprise also participated in similar stakeholder meetings directly and/or through PCMA regarding topics like red flags and warning signs related to prescribing and dispensing controlled substances. The express purpose of these stakeholder meetings was to foster open channels of communication, foster understandings, and to discuss collaborative actions.[89] Notably, membership in some stakeholders meetings and working groups included some of the Opioid Enterprise Manufacturers' front groups and trade

---

[88] *Id.*

[89] PPLPC019001069664    (11/14/2014);    PPLPC019001069666    (11/14/2014); PPLPC019001100901 (2/26/2015); PPLPC019001100905 (2/26/2015); PPLPC019001100919 (2/26/2015); PLPC019001100921 (2/26/2015).

association (e.g., PhRMA), opioid distributors, the National Association of Chain Drug Stores, and other PBMs and pharmacies.

306.    The foregoing facts, and as alleged in more detail herein, demonstrate that the Formulary & UM Enterprise arose from personal business relationships developed between the enterprise members in various ways over the course of at least the last two decades.

2.    The Common Purpose and Scheme of the Formulary & UM Enterprise

307.    The personal business relationships that formed the Formulary & UM Enterprise also allowed for the formation of a common purpose between the Opioid Enterprise Manufacturers and Express Scripts in the Formulary & UM Enterprise. Specifically, the Formulary & UM Enterprise was formed for the common purpose of illegally profiting from an expansion of the market for prescription opioids, and increased prescribing, dispensing, and sales of those drugs.

308.    The scheme that furthered the common purpose of the Formulary & UM Enterprise relied on misleading representations from Express Scripts to each one of its clients and to the public that it would structure formulary offerings and perform cDUR benefit services in the interests of its clients and patients to ensure that opioids were prescribed and dispensed only for safe and legitimate reasons. Instead of providing standard formulary and UM offerings that were in its clients' best interests or for safe and legitimate reasons, Express Scripts made decisions that gave the Opioid Enterprise Manufacturers and their prescription opioids unfettered and preferred formulary access, without UM, did not disadvantage any opioid compared with another in the same class or formulary tier, agreed to parity treatment for opioids within the same class and/or formulary, supported the Opioid Enterprise Manufacturers' pull-through marketing, pocketed enormous rebates and other fees, and (through its mail order pharmacies) dispensed prescription opioids without conducting the necessary due diligence.

309.    Each member of the Formulary & UM Enterprise played a part and furthered the common purpose of the Formulary & UM Enterprise.

310.    For their part, the Opioid Enterprise Manufacturers have been engaged in fraudulent conduct related to the marketing of prescription opioids beginning in the mid-1990s. The Opioid Enterprise Manufacturers engaged in a scheme, including through the regular use of the U.S. Mail or interstate wire facilities in furtherance of the scheme, to grow the market for prescription opioids through the use of branded and unbranded marketing materials, key opinion leaders ("KOLs") to give speaker presentations and publish about prescription opioids, and front groups which would contribute to and publish books, articles, documents, etc., all of which misrepresented the benefits and risks of prescription opioid use.

311.    The Opioid Enterprise Manufacturers commonly made the same misrepresentations through common KOLs and Front Groups. For example, each of the Opioid Enterprise Manufacturers made repeated misrepresentations about the risks and benefits of prescription opioids, including:

   a. The risk of addiction from chronic opioid therapy is low;

   b. To the extent there is a risk of addiction, it can be easily identified and managed;

   c. Signs of addictive behavior are "pseudoaddiction," requiring more opioids;

   d. Opioid withdrawal can be avoided by tapering;

   e. Long-term opioid use improves functioning;

   f. Alternative forms of pain relief pose greater risks than opioids;

   g. OxyContin provides twelve hours of pain relief; and

   h. New formulations of certain opioids, labeled abuse deterrent, successfully deter abuse.

312.    Each of the Opioid Enterprise Manufacturers made nearly identical representations about their branded drugs and/or unbranded prescription opioids as a class of drugs during the relevant time period.

313.    Each of the Opioid Enterprise Manufacturers used similar Front Groups to promote prescription opioid use. As examples, several of the Opioid Enterprise Manufacturers used Front Groups including, the following: the American Pain Foundation, the American Academy of Pain Medicine, the American Pain Society, Federation of State Medical Boards, the Alliance for Patient Access, the United States Pain Foundation, the American Geriatric Society, and the National Initiative on Pain Control.

314.    The Opioid Enterprise Manufacturers took an active role in guiding, reviewing, and approving many of the false and misleading statements issued by the Front Groups, ensuring that the Opioid Enterprise Manufacturers were consistently in control of their content and that it stayed on message in favor of more opioid prescribing. The Opioid Enterprise Manufacturers exercised control over and adopted their false and deceptive messages and acted in concert with the Front Groups and, through the Front Groups, with each other to deceptively promote the use of prescription opioids.

315.    Each of the Opioid Enterprise Manufacturers used similar KOLs and the strategy of paying opinion leaders and speakers who favored aggressive treatment of pain with prescription opioids. Pro-opioid doctors have been at the hub of the Opioid Enterprise Manufacturers' well-funded, pervasive marketing scheme since its inception and were used to create the grave misperception that opioids were safe and effective for chronic conditions. As examples, multiple Opioid Enterprise Manufacturers used similar KOLs including, but not limited to: Dr. Russell Portenoy, Dr. Lynn Webster, Dr. Perry Fine, and Dr. Scott Fishman.

316.    Each of these KOLs and numerous other, lower profile doctors, were paid to speak on behalf of prescription opioids as an unbranded class of drugs. They were used extensively to present the appearance that unbiased and reliable medical research supported the broad use of prescription opioids. These pro-opioid doctors also began to write, consult on, edit, and lend their names to books and articles. They gave speeches, and they served on committees, all the while encouraging the use of prescription opioids.

317.    The Opioid Enterprise Manufacturers also used branded and unbranded advertising and marketing; funded, edited and distributed pro-opioid publications; speakers bureaus and continuing education programs. Furthermore, as alleged above, Express Scripts often facilitated and/or disseminated the Opioid Enterprise Manufacturers' marketing strategies directly to doctors who prescribed for patients covered by Express Scripts' clients.

318.    One of the primary means by which the Opioid Enterprise Manufacturers disseminated their messaging about prescription opioids was through drug detailing: the practice of sending out pharmaceutical company representatives to provide details about specific branded products in order to persuade prescribers to begin writing (or write more) prescriptions for a specific product.

319.    The Opioid Enterprise Manufacturers adopted detailing as a key component of their prescription opioids strategy early on to capitalize on the unbranded marketing—developing carefully crafted marketing messages and tactics to deliver messages to prescribers through close relationships with sales representatives.

320.    Drug detailing is data driven, requiring identification of the prescribers who are writing high or low volumes of prescriptions, targeting places where additional messaging might be effective and to test the effectiveness of messaging. In accordance with common industry

practice, the Opioid Enterprise Manufacturers purchased and closely analyzed prescription sales data from companies like IMS Health (now IQVIA) and Express Scripts, which allowed them to track—precisely—the rates of initial and renewal prescribing by individual prescribers.

321.    The nexus between data and detailing helped drive the formation of the common purpose of the Formulary & UM Enterprise. In return for data and unfettered formulary placement from Express Scripts, the Opioid Enterprise Manufacturers were willing to pay higher rebates and other fees to Express Scripts.

322.    Once that occurred, Express Scripts once again supported the Opioid Enterprise Manufacturers' deceptive marketing regarding prescription opioids. After the Opioid Enterprise Manufacturers obtained Express Scripts' data and favorable formulary placement, the Opioid Enterprise Manufacturers' sales personnel immediately began to analyze their managed care or PBM data in order to "pull through" the formulary placement in order to drive increased sales.

323.    Formulary placement was viewed as a "win" and an opportunity to make the rebate agreements profitable by pulling through sales. Sophisticated presentations outlining the exact steps a sales representative should take were often included in the sales training materials. The impact of these agreements and the ability to pull-through increased sales using the PBM data was dramatic:[90]

---

[90] ENDO-CHI_LIT-00046379, slide 7

324.    Using the "Best Practices Identified" of: (1) Identifying the local UHC MC Opportunity; (2) Targeting the Right UHC Customer; (3) Hyper Targeting; (4) Delivering the Right Message; and (5) Consistent Cross-Functional Communication – the Pittsburgh District experienced dramatic growth in sales, as described by Endo:[91]

---

[91] *Id*. at slides 9 and 10.



325.    Formulary wins were a boon for each member of the Formulary & UM Enterprise. Each prescription opioid that enjoyed a favorable formulary placement, or continued to enjoy prescribing and dispensing without UM, ensured that all prescription opioids would continue to enjoy unrestricted sales due to the privity clauses that Express Scripts agreed to with each Opioid Enterprise Manufacturer. And, as indicated by the graph cited above, these wins increased sales. And, by increasing sales, the wins increased profits for the Opioid Enterprise Manufacturers whose drugs were sold and for the PBM who received rebates and administrative fees tied to sales.

326.    However, Express Scripts took on obligations to perform and made representations that they would conduct point-of-sale review and take actions to ensure that only safe and legitimate prescriptions were being filled when Express Scripts had no intention of doing so. Had Express Scripts taken the actions they had promised their clients, it would have dramatically reduced medically inappropriate prescribing, sales and dispensing of prescription opioids. As alleged more fully herein, Express Scripts' failure to do so had a significant role in allowing opioids to flood into West Virginia.

327.    Express Scripts also paid lip service to its commitment to acting to fight against prescription drugs, including opioids, waste and abuse.

328.    But Express Scripts' claims that it was addressing opioid waste and abuse were only empty promises. For example, upon information and belief, one former Fraud, Waste and Abuse investigator for Express Scripts from 2013 to 2019 explained that even when they identified blatant instances of pill seekers and pill mill doctors, nothing happened. "No one really cared," he said. "No one really followed up on anything. The members were just like a number. We'd totally forget this was a human being because it was just a case number. We'd just look at it, type it up and it was gone. They never got the help they needed. I never heard this person is in rehab."

329.    Moreover, upon information and belief, as far as the former investigator knew, none of his findings were ever shared with law enforcement, even if it involved well documented pill mill doctors or pill seekers. He explained that, when he was hired, he thought he would be investigating "serious major fraud, all of these people writing all of these false prescriptions," he said. "I just thought it was more investigation stuff." They would re-run patients and doctors' names every five months, he said. "We'd see the same people over and over," he said. "Just because we identified the behavior didn't mean it stopped. We'd just call the doctors and they didn't even care. They just felt this patient was in pain, but we're not going to do anything about it. It wouldn't be rare to have [the bad doctors] written up twice in a year. . . . I'd say 90 percent of the reports never got read in my opinion. . . . Let's say I spent months, sometimes weeks on a report—it's being written for the manager. It really doesn't go anywhere else."

330.    Similarly, PCMA and some of its PBM members participated in coalitions or external activities indicating that they were "increasing awareness and decreasing misuse."

331.    Express Scripts hid these facts from its clients. Upon information and belief, in a telling exchange in 2002, when Highmark Blue Cross Blue Shield decided it would put a 300mg daily limit on a drug, Medco pushed back because this meant that Medco would lose Purdue rebates if there was a limit below 320mg per day. Here, as alleged, was evidence that an action could have been taken to drastically limit inappropriate prescribing, sales and dispensing, but it was ignored in favor of the action that advanced the common purpose of the Formulary & UM Enterprise. Instead of acting to limit medically unnecessary and inappropriate prescribing, sales and dispensing, an August 18, 2002, email from Purdue National Account Director Bernadette Katsur reveals that a Medco Vice President convinced its client—Highmark—to drop its daily dosage limit.

332.    Express Scripts regularly delayed taking actions that could have dramatically reduced medically inappropriate prescribing, sales and dispensing despite promises from it to do the same. As an example, on information and belief, in a March 2017 email, there were several employees from Express Scripts who derided the decision by the Express Scripts Value Added Committee to overrule the PA limit on OxyContin, stating that the decision did not sit well with them at all. As Express Scripts employees noted, this decision made no clinical sense. Without question, the PA limit would have dramatically reduced medically inappropriate prescribing, sales, and dispensing which would have impacted "rebate gain."

333.    Further, Express Scripts owns and operates a mail order pharmacy that dispensed massive amounts of branded and generic opioids without performing the requisite due diligence on prescriptions or refusing to fill prescriptions that could not be resolved through due diligence. By dispensing branded and generic prescription opioids without performing the requisite due diligence on prescriptions or refusing to fill prescriptions that could not be resolved through due

diligence, Express Scripts' mail-order pharmacy furthered the common purpose of the Formulary & UM Enterprise.

334.    The Formulary & UM Enterprise maintained a common purpose from the late 1990s through to the present day, creating sufficient longevity in their personal business relationships for them to pursue the common purpose of the Formulary & UM Enterprise.

### 3.   Conduct and Participation of the Formulary & UM Enterprise Through a Pattern of Racketeering Activity

335.    The common purpose of the Formulary & UM Enterprise was perpetrated through a misleading scheme fulfilled by multiple illegal acts of and by unlawful possession and dispensing of controlled substances. Express Scripts' predicate acts constitute a pattern of racketeering activity.

336.    The pattern of racketeering activity used by Express Scripts and the Express Scripts Mail Order Pharmacy likely involved thousands of separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the scheme through which the common purpose was achieved.

337.    Use of the mail and wire facilities began with the formation of the Formulary & UM Enterprise. Negotiations and communications about the contracts between Express Scripts and the Opioid Enterprise Manufacturers occurred through interstate mail and wire facilities and involved meetings, communications, and negotiations about contracts between Express Scripts and the Opioid Enterprise Manufacturers, the Opioid Enterprise Manufacturers' marketing and Express Scripts' assistance therewith, and pull-through marketing which required the transmission of large volumes of data.

338.    The Opioid Enterprise Manufacturers and Express Scripts regularly and continuously communicated through the use of the U.S. Mail and interstate wire facilities in

furtherance of the common purpose of the Formulary & UM Enterprise and their fraudulent scheme, including discussions of formulary placement, prior authorization limits, step therapy, preferred formulary status and their impact on opioid prescribing and dispensing and, relatedly, rebates and other fees. Importantly, rarely mentioned during these discussions was the impact of the burgeoning opioid epidemic. These discussions were clearly intended to further the common purpose of the Formulary & UM Enterprise, happened over at least the last two decades (beginning with Purdue's work with predecessors of Express Scripts and continuing to involve more Opioid Enterprise Manufacturers over time), and reveal the ongoing personal business relationships that developed between the members of the Formulary & UM Enterprise.

339.    Similarly, Express Scripts engaged in significant pull-through marketing assistance with each Opioid Enterprise Manufacturer. Express Scripts, through the regular use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme, agreed to provide the Opioid Enterprise Manufacturers with preferred formulary placement and prescribing data. This ensured that the unfettered formulary access (granted despite Express Scripts' contrary representations to the public and their clients), would facilitate unrestricted opioid prescribing and dispensing. Pull-through efforts were undertaken after each formulary announcement "win" in order to drive the Opioid Enterprise Manufacturers' profitability. Express Scripts was not only aware of this pull-through marketing, it actively joined in efforts with the Opioid Enterprise Manufacturers by creating reports about the "value proposition" of unrestricted use of prescription opioids as alleged more fully herein.

340.    Finally, Express Scripts and the Opioid Enterprise Manufacturers regularly (and through the regular use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme) participated in trade industry associations and informal coalitions that provided recurring

non-contractual opportunities and forums in which to continue developing personal business relations and in which they formed a common purpose of growing the unfettered use of opioid drugs.

341.    Express Scripts engaged in essentially uniform conduct with the Opioid Enterprise Manufacturers whereby Express Scripts granted the Opioid Enterprise Manufacturers' drugs unfettered formulary access (including preferred formulary placement coupled with refraining from UM) despite its public promises and contractual obligations to make formulary and UM decisions in their clients' best interests, and facilitated their pull-through marketing and/or directly facilitated the dissemination of their marketing messages. Express Scripts also provided the Opioid Enterprise Manufacturers with PBM data so that they could pull through the formulary "wins" and drive increased prescribing. At the back end of the scheme, Express Scripts profited from receiving rebates and other fees while the Opioid Enterprise Manufacturers enjoyed increased sales through pull through marketing and unfettered formulary access.

342.    The unlawful scheme was advanced through mailings and interstate wire transmissions that constitute racketeering activity. Collectively, these violations constitute a pattern of racketeering activity, through which Express Scripts, the Express Scripts Mail Order Pharmacy, and the Opioid Enterprise Manufacturers deceived and intended to decieve West Virginia.

343.    Express Scripts and the Express Scripts Mail Order Pharmacy devised and knowingly carried out an unlawful scheme using materially false pretenses, representations, promises, or omissions regarding their conduct. Express Scripts promised to perform pharmacy benefit management services, including cDURs, formulary decisions, and UM decisions in their

clients' best interests and in ways that would ensure safe and effective prescribing. These promises were made in person, in publications, and through the mail and the wires.

344.    Express Scripts and the Express Scripts Mail Order Pharmacy did not intend to comply with their contractual obligations, the promises to their clients, or their public representations. Express Scripts and the Express Scripts Mail Order Pharmacy intended to continue to make decisions and take actions that benefitted the members of the Formulary & UM Enterprise and its common purpose by failing to perform cDURs, granting unfettered formulary access, and blocking implementation of any UM measures, which directly contradicted their public promises and contractual obligations.

345.    Express Scripts and the Express Scripts Mail Order Pharmacy intended that its common purpose and scheme to deceive and defraud would, and did, use the U.S. Mail and interstate wire facilities intentionally and knowingly with the specific intent to advance and for the purpose of executing the unlawful scheme.

346.    By engaging in its intended conduct, as alleged more fully herein, Express Scripts and the Express Scripts Mail Order Pharmacy engaged in deceptive, misleading, fraudulent and unlawful conduct constituting a pattern of racketeering activity.

347.    Express Scripts and the Express Scripts Mail Order Pharmacy used the U.S. Mail and interstate wire facilities to perpetrate the deceptive, misleading, and fraudulent scheme of the Formulary & UM Enterprise with thousands of communications, publications, representations, statements, electronic transmissions, and payments including, but not limited to:

       i.  Contracts negotiated and circulated between members of the Formulary & UM Enterprise;

      ii.  Contracts negotiated and circulated between Express Scripts and its clients;

iii. Public representations by the Opioid Enterprise Manufacturers and Express Scripts about their commitment to addressing misuse, abuse, and diversion of prescription opioids;

iv. Marketing materials about prescription opioids transmitted between the Opioid Enterprise Manufacturers and Express Scripts that were later disseminated by Express Scripts;

v. Communications between Express Scripts and their clients about their commitment to following the terms of their respective contracts;

vi. Communications between the Opioid Enterprise Manufacturers and Express Scripts regarding formulary changes;

vii. Communications between the Opioid Enterprise Manufacturers and Express Scripts regarding and including PBM prescribing data;

viii. Transmission of rebate payments; and

ix. Transmission of payments from the clients of Express Scripts.

348. To achieve the common purpose of the Formulary & UM Enterprise, Express Scripts, the Express Scripts Mail Order Pharmacy, and the Opioid Enterprise Manufacturers hid from their clients, patients, regulators and West Virginia: (a) the deceptive, misleading, and fraudulent nature of the scheme; (b) the deceptive, misleading, and fraudulent nature of their representations; (c) their intention to ignore their contractual cDUR obligations; (d) intent to make formulary and UM decisions that failed to limit the medically unnecessary and inappropriate prescribing, sales, or dispensing of prescription opioids or address misuse, abuse, and diversion; and (e) the true nature of the association between each member of the Formulary & UM Enterprise.

349. Each member of the Formulary & UM Enterprise, including Express Scripts and the Express Scripts Mail Order Pharmacy, agreed with the overall objective of the Formulary & UM Enterprise's deceptive, misleading, and fraudulent schemes and participated by taking action that furthered the common purpose of the Formulary & UM Enterprise..

350.    The pattern of racketeering activity involving the unlawful possession and dispensing of controlled substances in Schedules II through IV likely involved thousands, if not millions, of improperly dispensed prescriptions for branded and generic prescription opioids in violation of the CSA and Express Scripts' registration as a mail-order pharmacy. Express Scripts knowingly and intentionally possessed and dispensed branded and generic prescription opioids for reasons that were not authorized by the CSA.

351.    The predicate acts of the Formulary & UM Enterprise all had the purpose of furthering the opioid epidemic that substantially injured West Virginia's business and property, while simultaneously generating billion-dollar revenue for Express Scripts and its mail order pharmacies. The predicate acts were committed, and/or caused to be committed, by Express Scripts and its mail order pharmacy through their participation in the Formulary & UM Enterprise and in furtherance of the fraudulent schemes, unlawful possession and dispensing of controlled substances, and common purpose thereof.

4.   Express Scripts Concealed Its Unlawful Conduct

352.    Express Scripts' conduct described herein was concealed from West Virginia and the public at large.

353.    Express Scripts intentionally undertook efforts to conceal its conduct by misrepresenting its role in the pharmaceutical marketplace as promoting safe and effective use of opioids, and failing to make public information in its possession and control that would have revealed the truth regarding its relationships with manufacturers and its financial interest in the increased utilization of opioid medications.

354.    Express Scripts hid the details of its relationships with opioid manufacturers.

355.    West Virginia did not and could not have known that Express Scripts developed its national formularies based on profit and rebates, not based on the safety and efficacy of the medications as they claim.

356.    West Virginia did not learn that it had been injured by Express Scripts' actions, the source of those injuries, or that those injuries were part of a pattern of conduct until only recently, until documents revealing those facts were produced in discovery by various entities in *In re: National Prescription Opiate Litigation*, Case No. 1:17-md-2804-DAP (N.D. Ohio) and other opioid litigation, including the documents cited, quoted, and relied on throughout this complaint. These documents—and the facts they contain—have never before been made public, nor have they ever before been in West Virginia's possession, and were not otherwise available to West Virginia before being produced in discovery.

357.    Express Scripts undertook efforts, including through the use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme, to purposefully conceal its wrongful conduct by: (1) manipulating and distorting public information, knowledge, and facts; (2) misrepresenting its role in the pharmaceutical market as promoting safe use and appropriate opioid dispensing; (3) assuring the public and governmental authorities that it was complying with its obligations and was acting to prevent diversion and drug abuse; (4) hiding the true nature of its relationships with the Opioid Enterprise Manufacturers; (5) failing to make public or otherwise produce nonpublic information, over which Express Scripts had exclusive possession, dominion, and control, that would have revealed the truth; (6) entering into overly broad confidentiality agreements with entities in the supply chain with whom it contracted; and (7) by deliberately and fraudulently concealing the truth.

358.    Express Scripts intended that its false statements and omissions be relied upon.

359.    Express Scripts knew of its wrongful acts and had material information pertinent to their discovery, but concealed that information from West Virginia.

360.    Only Express Scripts knew of its widespread misinformation campaign and of its repeated, intentional failures to prevent opioid overutilization and diversion.

361.    Due in large part to its deceptive, intentional, and deceitful conduct, the full scope of Express Scripts' wrongful conduct and its central role in the opioid epidemic has not yet come to light.

### E.    Express Scripts' Pattern of Misrepresentations Has Continued to the Present and Serves as a Cover for Its Profiteering Off of the Crisis It Helped Create

362.    On December 17, 2024, the New York Times published a bombshell pieced entitled *The Middlemen: Giant Companies Took Secret Payments to Allow Free Flow of Opioids*, which detailed the steps Express Scripts took to facilitate and exacerbate the opioid crisis and, in part, informs the allegations of this Complaint.[92] These allegations include but are not limited to the facts that (1) Purdue paid PBMs tens of millions in rebates related to opioids; (2) Express Scripts entered into one or more contracts that removed insurance obstacles for the "free" flow of opioids; and (3) Express Scripts' decision to charge clients that opted for opioid safeguards to "make up for the rebate hit[.]"

363.    In response, without denying the substance of the New York Times' allegations, Express Scripts published on its website misrepresentations about its role in the opioid crisis, including that:

      a.    "PBMs like Express Scripts were not in a position to cause the opioid epidemic."

      b.    "Rebates did not drive overprescription by doctors or formulary placement for opioids."

---

[92] https://www.nytimes.com/2024/12/17/business/pharmacy-benefit-managers-opioids.html.

c.   "For more than two decades, Express Scripts has been an acknowledged leader in the fight against prescription opioid abuse and misuse."

364.    Express Scripts made a similar statement in response to a report by *Barron's* in 2024, which identified its contribution to the Opioid crisis. Similar to its response to the *New York Times*, Express Scripts maintained that it has engaged in work "over multiple decades to help combat the opioid crisis" and that it "is a leader in the fight against Opioid prescription abuse and misuse."[93]

365.    The reasons for this continued denial are obvious. While Express Scripts cannot acknowledge responsibility in the face of myriad lawsuits including this one, it also cannot afford to further erode public and governmental trust in the face of increased public scrutiny, which has, in some instances, threatened to end entire lines of business. While all fifty states have passed varying legislation to regulate PBM practices, just this year, Arkansas became the first state in the nation to pass a law banning PBMs from owning pharmacies.[94] From a federal level, PBMs have faced investigation and a lawsuit by the FTC and have been threatened by potential legislation, including the DRUG Act, which, among other things, would prevent PBMs like Express Scripts from steering patients to their own pharmacies.

366.    Express Scripts must also preserve its reputation in the face of its health plan and benefit clients, which choose it to administer their prescription drug benefits, and those who fulfill their medications through the Express Scripts Mail Order Pharmacy.

---

[93] https://www.barrons.com/articles/pbm-drug-prices-insulin-opioid-crisis-dcf9e83c.

[94] https://www.fiercehealthcare.com/regulatory/arkansas-governor-signs-bill-barring-pbms-owning-pharmacies.

367.    Indeed, the Express Scripts Mail Order Pharmacy represents yet another instance of continued opioid profiteering and remains a source of revenue for the crisis it helped create. Per a report published by the *Wall Street Journal*, even the price of generic drugs fulfilled by a PBM mail-order pharmacy can be as much as three times higher than the same drug filled by a brick-and-mortar pharmacy.[95] This is compounded by the fact that Express Scripts actively attempts to steer patients to its own pharmacy and away from local brick-and-mortar pharmacies through promises of cheaper drugs.[96]

368.    Despite state and national efforts to address the opioid crisis, reduce dependency, and lower prescriptions, the U.S. opioids market was estimated to be worth $7.3 billion in 2024 and will be worth almost $9 billion by 2034.[97] And, Express Scripts wants its piece. To remain a trusted source of opioids and other controlled substances, it must adhere to and repeat the misrepresentation to this day that it played no role in the opioid crisis and has for decades tried to reduce opioid misuse and abuse.

369.    Although opioid prescriptions dispensed at brick-and-mortar pharmacies have declined from 2019 to 2023 (including in West Virginia), the Centers for Disease Control ("CDC"), which tracks prescriptions dispensed at "retail" pharmacies, does not report opioid prescriptions fulfilled through PBM mail-order pharmacies, including the Express Scripts Mail

---

[95] https://www.wsj.com/health/pharma/higher-drug-costs-mail-order-prescription-bf37886f.

[96] https://www.wsj.com/health/pharma/drug-middlemen-push-patients-to-pricier-medicines-house-probe-finds-80c20fda.

[97] https://www.precedenceresearch.com/opioids-market#:~:text=The%20U.S.%20opioids%20market%20size,market%20due%20to%20several%20factors.

Order Pharmacy operated by Express Scripts.[98] Nor does Express Scripts otherwise publicly report and publish data on opioid prescriptions filled through its pharmacy. Thus, despite touting measures aimed to reduce opioid over prescription and abuse, Express Scripts chooses not to report opioid prescriptions fulfilled its own pharmacy, which delivers opioids all over the country, including to West Virginia.

370.    And, there is reason to believe that opioid prescriptions have increased at online and mail-order pharmacies like the Express Scripts Mail Order Pharmacy. Despite the decline of opioid prescriptions filled at brick-and-mortar pharmacies, new electronic prescriptions ("e-prescriptions") for opioids have ballooned during 2019-2023. The number of new e-prescriptions for opioids grew by 57.1% from 2019 to 2020, 26.0%, 7.8% and 5.1% from 2020-2021, 2021-2022, 2022-2023, respectively.[99] This growth of opioid e-prescriptions has largely tracked e-prescriptions for all controlled substances, which has grown exponentially from 2013 through 2023, reaching 302.9 million prescriptions in 2023.[100]

371.    Express Scripts has continued to make false, deceptive, or misleading statements or misrepresentations about its role in the opioid crisis, the nature of rebates, and the efforts it took to curb prescription opioid abuse to the present day.

---

[98] https://www.cdc.gov/overdose-prevention/data-research/facts-stats/us-dispensing-rate-maps.html?utm_; *see id*., footnote B (stating "[t]his database does not include mail-order prescriptions.").

[99] https://www.ispor.org/docs/default-source/intl2024/ispor24roufaeleph20poster138991-pdf.pdf?sfvrsn=f7df82b4_0.

[100] https://www.statista.com/statistics/864367/number-of-us-e-prescriptions-for-controlled-substances/.

**F.      Express Scripts' Facilitation and Encouragement of the Use of Opioids Was a Cause of a Public Health Crisis in West Virginia**

372.     The opioid epidemic has touched nearly every American—either directly or indirectly—and its toll continues to mount. According to the CDC, prescription opioids have played a direct or indirect role in over 80% of overdose deaths in the United States, a crisis that has worsened over the past two decades. The death toll from opioids has now surpassed fatalities from car accidents and firearms. Today, more than 175 Americans die every day from opioid overdoses.

373.     In addition to the toll on families and loved ones, opioid use imposes significant economy-wide costs. The U.S. Congress Joint Economic Committee estimates the opioid epidemic cost $1.04 trillion in 2018, $985 billion in 2019 and nearly $1.5 trillion in 2020 alone, up 37% from 2017 when the CDC last measured the cost. The rise in fatal opioid overdoses in 2022 suggests the total cost is likely to continue to increase.

374.     West Virginia is ground-zero of the opioid epidemic that Express Scripts caused, contributed to, and maintained and the State is experiencing a drug overdose epidemic that is causing devastating social and economic consequences throughout the State.

375.     Between 2006 and 2014, the State was flooded with approximately 1.1 billion hydrocodone and oxycodone pills. The massive over-shipment amounts to 611 pain pills for every man, woman and child in the State.

376.     As the volume of prescription opioids flooding into West Virginia increased, so, too, did the death toll. West Virginia has had the highest opioid overdose per capita death rate in the nation for the last ten out of ten years. The State also has one of the highest prescription rates of opioids in the United States. West Virginia ranks in the top 10 for the highest rate of prescriptions written for high-dose opioids and extended-release opioids.

377.    West Virginia is the state with the highest age-adjusted death rate from opioid use over this time period; in terms of absolute deaths, from 1999 to 2019 there have been a total of 10,054 drug overdose deaths in West Virginia.

378.    More specifically, deaths in West Virginia that listed opioids as a cause of death have also increased, from 1.55 per 100,000 in 1999 to 37.27 per 100,000 in 2019. In terms of per capita rates, compared to the national average, West Virginia has had the highest rate of opioid overdose in the country from 1999 to 2019.

379.    The increased volume of opioid prescribing and the volume of opioids in West Virginia correlates directly to skyrocketing addiction, abuse, overdose, and death in West Virginia; black markets for diverted prescription opioids; and a concomitant rise in heroin, fentanyl, and methamphetamine abuse by individuals who could no longer legally acquire—or simply could not afford—prescription opioids.

380.    There has been a dramatic rise in the number of infants who are born addicted to opioids due to prenatal exposure and suffer from neonatal abstinence syndrome ("NAS," also known as neonatal opioid withdrawal syndrome, or "NOWS"). These infants cry nonstop from the pain and stress of withdrawal, experience convulsions or tremors, have difficulty sleeping and feeding, and suffer from diarrhea, vomiting, and low weight gain, among other serious symptoms. When untreated, NAS can be life-threatening.

381.    There has also been a startling increase in infants born with NAS in West Virginia.

382.    Indeed, the rate of NAS in West Virginia increased over fourfold from 2008 to 2017, from 10.64 per 1,000 births in 2008 to 56.17 per 1,000 births in 2017

383.     In West Virginia, the rate of opioid-related inpatient hospital treatments more than doubled in less than 10 years, from 218 per 100,000 in the first quarter of 2009 to 465 per 100,000 in the second quarter of 2019

384.     Medical and expert evidence indicates that in 2019, the prevalence of Opioid Use Disorder ("OUD") was approximately 4% in West Virginia.

385.     Given the approximate 72,032 adults in West Virginia experiencing mild to severe OUD, there have been serious consequences of opioid use to children in West Virginia, with an estimated 42,500 children in West Virginia being exposed to parental opioid use during adolescent development. An estimated 4,000 children in West Virginia have had a parent die from overdose or another opioid-related cause.[101]

386.     The opioid epidemic has created a strain on the foster care system as it is now stretched dangerously thin. Additionally, the majority of foster care system placements in West Virginia are due to parental drug use, a substantial portion of which would be expected to be opioid use given the high burden of addiction in West Virginia. Overall, approximately 13.0 children per 1,000 in West Virginia are separated from families due to concerns about child welfare, which is higher than any other state in the United States.[102]

387.     The State has been particularly ravaged by the opioid epidemic caused by Express Scripts' wrongful actions. The State has suffered from opioid related addiction, abuse, overdose, and death which has had severe and far-reaching public health, social services, and criminal justice

---

[101] The Ripple Effect: National and State Estimates on the U.S. Opioid Epidemics Impact on Children, https://uhfnyc.org/publications/publication/ripple-effect-chartbook/.

[102] Moving Upstream: Improving Child Welfare in West Virginia Requires Addressing Root Causes of Hardship, West Virginia Center on Budget and Policy, https://wvpolicy.org/moving-upstream-improving-child-welfare-in-west-virginia-requires-addressing-root-causes-of-hardship-2/.

consequences, health, social services, and criminal justice consequences which have created a significant and unreasonable interference with the public health, the public safety, the public peace, the public comfort and/or the public convenience in West Virginia.

388.    As the volume of prescription opioids flooding into West Virginia increased, the State suffered harm caused by the volume of opioids including abuse, addiction, overdose, and death, as well as other harms such as emergency medical service responses for suspected overdoses, emergency department visits for overdose, naloxone administration prior to emergency medical services, increased burden on the treatment and chemical dependence provider system, OUD and opioid use among both adults and adolescents, and neonatal abstinence syndrome ("NAS").

389.    Opioid abuse and addiction also cause increased emergency room visits, inpatient hospitalizations, and emergency medical technicians' administration of naloxone, the antidote to opioids.

390.    As a result of the increase in overdoses, West Virginia has also sustained high costs related to emergency medical care and first responders.

391.    Express Scripts' conduct has also had a significant effect on the increase of crime and related criminal justice expenses within West Virginia.

392.    While Express Scripts was reaping millions of dollars in profits from its wrongful conduct, the State has been required to allocate substantial public monies and resources to combat the opioid crisis and cope with its fallout.

### G.    The State's Claims Are Timely

#### 1.    Continuing Violation

393.    To this day, the State continues to suffer significant harm as a result of the unlawful, wrongful, and tortious conduct of Express Scripts. Express Scripts' conduct has created an ongoing

and continuous threat to and significant interference with public health, safety, comfort, and/or convenience.

394.   That conduct is ongoing, and the resulting injuries are not isolated or singular but are repeated and continuous in nature. Express Scripts Defendants' conduct and/or the resulting injuries are ongoing at least in the following ways:

   a.   Rampant opioid abuse, addiction, overdose, injuries, and deaths, which persist as a result of Express Script's conduct;

   b.   Opioid over-prescription. As of 2023, 46.4 opioid prescriptions were dispensed per 100 persons in West Virginia;

   c.   The creation and fostering of an illegal secondary market for prescription opioids, which continues to exist; and

   d.   Increased costs and expenses for the State relating to healthcare services, law enforcement, the criminal justice system, social services, and/or education systems.

395.   The harms have not occurred all at once; instead, they have accumulated and intensified over time. Because Express Scripts' wrongful actions persist, the tort is not complete, and the full extent of the damages has yet to be realized. The unlawful, false, deceptive, or misleading conduct has not ceased, the public nuisance remains unabated, and the actions causing harm continue to this day—inflicting continued injury on the State.

396.   Express Scripts' wrongful conduct which helped to cause or contributed to the opioid epidemic continues to cause harm and remains unabated.

### 2.   Equitable Estoppel and Concealment

397.   Express Scripts engaged in a sustained, calculated effort to conceal its central role in fueling the opioid epidemic—deceiving the State of West Virginia, and the public at large. Its conduct included colluding with opioid manufacturers to deceptively market opioids and reshape public perception of their risks, ignoring glaring evidence of misuse, addiction, and diversion

apparent in its own data, and leveraging that same data to further support opioid marketing campaigns. Express Scripts placed opioids on its national formularies with preferred status and minimal restrictions in exchange for lucrative rebates and fees, failed to implement effective controls in its mail-order pharmacy operations, and turned a blind eye to suspicious prescribers— all while falsely presenting itself as a neutral gatekeeper committed to safety and appropriate medication use.

398.    Internally, Express Scripts knew that it was making formulary and utilization decisions based on profitability—not patient safety—but publicly misrepresented its role in the pharmaceutical marketplace. The company repeatedly assured regulators, plan sponsors, and the public that it was acting to prevent diversion and drug abuse, all while concealing the true nature of its financial relationships with opioid manufacturers. It withheld critical information under its exclusive control, entered into overly broad confidentiality agreements, and even initiated legal action to prevent the release of contracts and data that would have revealed its misconduct.

399.    This was not passive concealment—it was a deliberate campaign to mislead. Express Scripts' misrepresentations were made in contracts, client communications, public statements, on its website, in publications, and in Congressional testimony. It actively marketed itself as an industry leader committed to preventing misuse and diversion, all while intentionally failing to enforce even the most basic controls, such as cDURs, against inappropriate opioid prescribing.

400.    Express Scripts hid the details of its relationships with opioid manufacturers.

401.    The State of West Virginia did not and could not have known that Express Scripts developed its national formularies based on profit and rebates, not based on the safety and efficacy of the medications as it claims.

402.    As a result of this systematic deception, the State of West Virginia could not have reasonably discovered the full extent of Express Scripts' misconduct.

403.    Express Scripts is therefore equitably estopped from asserting any statute of limitations defense. Its repeated misrepresentations and omissions were specifically designed to be relied upon by West Virginia, and West Virginia reasonably relied on those statements in believing Express Scripts was fulfilling its obligations under the law. These misstatements deprived West Virginia of the knowledge necessary to assert claims in a timely manner. Accordingly, the limitations period is tolled. West Virginia's claims remain timely because Express Scripts' misconduct was intentionally concealed and has only recently come to light after years of calculated deception.

404.    Express Scripts intended its false statements and omissions to be relied upon. Express Scripts knew of its wrongful acts and had material information pertinent to its discovery, but concealed the information from the public, including from the State of West Virginia.

405.    Express Scripts knew of its widespread misinformation campaign and of its repeated, intentional failures to prevent opioid overutilization and diversion and concealed this information from the public, including from the State of West Virginia.

406.    Due in large part to its deceptive, intentional, and fraudulent conduct, the full scope of Express Scripts' wrongful conduct and its central role in the opioid epidemic has not yet come to light.

**H.    Successor Liability**

407.    To the extent that the wrongful acts or omissions alleged herein were committed or omitted by predecessor entities, their respective successor entities are liable for those acts or omissions because (1) they expressly or impliedly assumed the predecessor's liability, (2) there was a consolidation or merger of predecessor and successor, (3) the surviving entity was a mere

continuation of the predecessor or (4) when the transaction is entered into fraudulently to escape liability for the debts and liabilities. To the extent there was no formal merger of predecessor and successor, the respective successor entities are also liable for the wrongful acts or omissions of their respective predecessors based on the doctrine of de facto merger based on the factors of (a) continuity of shareholders resulting from the purchasing corporation paying for the assets with shares of its own stock so the selling corporation stockholders become a constituent part of the purchasing corporation; (b) cessation of ordinary business and dissolution of the predecessor; (c) assumption by the successor of liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (d) continuity of management, personnel, and general business operation of the predecessor. The details regarding the foregoing facts are particularly within the knowledge and control of the respective defendants charged with wrongdoing and cannot be pleaded in greater detail by Plaintiff without discovery.

## I.    Alter Ego Liability

408.    To the extent that the wrongful acts or omissions alleged herein were committed or omitted by wholly owned or majority-owned entities, the parent entities are liable for those acts or omissions as alter egos because (1) they dominated and controlled the wholly owned or majority-owned entity and (2) exercised that domination and control to perpetrate a wrong or injustice. The details regarding the foregoing facts are particularly within the knowledge and control of the respective defendants charged with wrongdoing and cannot be pleaded in greater detail by the State without discovery.

## J.    West Virginia is Entitled to Exemplary Damages

409.    As set forth above, Express Scripts deliberately engaged in conduct designed to increase the sales and profitability of opioid medications. Despite knowing that massive and suspicious quantities of opioids were flooding States across the United States—including in West

Virginia—it failed to take any meaningful steps to curtail deceptive marketing, end preferential formulary placement, or implement UM measures that could have reduced opioid oversupply. Express Scripts had real-time access to data revealing the scope of the crisis, yet it refused to act on that information or use it to prevent diversion. Instead, it actively colluded with opioid manufacturers in the fraudulent promotion and oversupply of opioids; accepted rebates and fees in exchange for favorable formulary placement; removed or weakened critical UM; failed to implement effective drug utilization review measures despite purporting to do so; and dispensed massive quantities of opioids through its mail-order pharmacies without proper oversight or controls.

410.     This ongoing course of conduct was knowing, deliberate, and reckless—inflicting significant harm on public health and safety, and causing widespread economic damage and government liability across the nation. Express Scripts acted with malice and in a manner that constitutes aggravated and egregious fraud, demonstrating conscious disregard for the rights and safety of others, despite the obvious and substantial risk of harm. Its conduct continues to fuel an opioid epidemic that remains unabated in West Virginia. By knowingly abandoning its duties under West Virginia law, exploiting regulatory gaps, and abusing its privileged position as a dispenser of controlled substances, Express Scripts has perpetuated a public health catastrophe.

## V.    CLAIMS FOR RELIEF

### COUNT ONE

### NEGLIGENCE

411.    The State adopts, realleges, and incorporates by reference paragraphs 1 through 410 of this Complaint as if fully set forth herein and further alleges as follows.

412.    Negligence is established where the defendant owes the plaintiff a duty of care, breaches that duty, and the plaintiff sustains an injury or loss proximately caused by the defendant's breach.

413.    Express Scripts owed and continues to owe the State common law and statutory duties to employ reasonable standards of care in the sale, delivery, dispensing, promotion, and gatekeeping control of the supply of highly addictive, dangerous opioids. This includes a duty to not create a foreseeable risk of harm or injury.

414.    Express Scripts breached these duties by promoting opioid over-use and by facilitating access to opioids through its standard formulary and UM offerings and its mail order pharmacies, setting in motion a force that created an unreasonable and foreseeable risk of harm and peril to the State. In so doing, Express Scripts acted with actual malice.

415.    Express Scripts also undertook and assumed a duty to create formulary and UM offerings based on the health and safety of the public and of the lives covered by the benefit plans that were its clients. Express Scripts represented to the public, as well as to its clients, that it was structuring formulary and UM offerings based on the health and safety of the public and the lives its clients insured, when in fact it was doing the exact opposite and doing it to maximize its own revenue in concert with the opioid manufacturers. Express Scripts knew, at the time that it made these representations to the public and to its clients, that it would not base its formulary and its UM offerings on the health and safety of the covered lives involved, nor of the public, but rather

that it would structure, and was already structuring, formulary and UM offerings solely (or at least primarily) to increase profits to Express Scripts.

416. Express Scripts undertook to render services which it knew, or should have known, were necessary to protect the interests of the State, and failed to exercise reasonable care in doing so. As a result, Express Scripts increased the risk of harm to the State and caused injury to the State of West Virginia.

417. Express Scripts had actual or at the very least constructive knowledge of the overuse and oversupply of opioids because of its access to claims and other data which it developed and maintained. Express Scripts also had the ability to curtail the overuse and oversupply of prescription opioids because of its unique gatekeeping function in the pharmaceutical supply chain. Yet, despite this knowledge and ability, Express Scripts refused and failed to take necessary and appropriate actions to prevent the harms which were the foreseeable consequence of its failures, actions and inactions.

418. Express Scripts, having facilitated and set in motion the over-use and over-supply of opioids, had a duty to use reasonable care to prevent and curtail the spreading opioid crisis.

419. Express Scripts breached this duty by failing to exercise reasonable care or skill with respect to its opioid-related conduct. Express Scripts made highly addictive prescription opioids available to the marketplace with the knowledge that it was likely being used for non-medical purposes and/or posed an inherent danger, especially to patients who were using opioids for chronic pain not associated with active cancer, end-of-life or palliative care. Express Scripts knew or reasonably should have known that its breach would foreseeably cause harm to the State.

420.    Express Scripts knew or in the exercise of reasonable diligence should have known under the circumstances of this case that the harms suffered by the State were the reasonably foreseeable consequences of Express Scripts' failures, actions and inactions.

421.    Express Scripts' conduct also foreseeably created a new secondary market for opioids—supplying both the narcotics for illicit distribution and fueling demand through widespread opioid addiction. The result of Express Scripts' deceptive and improper conduct was not only an explosion of prescription opioids on the black market, but also—predictably—a significant increase in the availability of heroin and synthetic opioids.

422.    It was reasonably foreseeable to Express Scripts that the burden of the opioid crisis would fall to the State in the form of social and economic costs. Express Scripts' negligence was a substantial factor in producing harm to the State.

423.    The injuries to the State would not have happened in the ordinary course of events had Express Scripts exercised the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of its business in the sale, delivery, dispensing, promotion, and gatekeeping control of opioids.

424.    Express Scripts has breached, and continues to breach, its common law duties to the State by, among other things:

    a.    Failing to exercise reasonable care or skill with respect to its opioid-related conduct;

    b.    Placing its profit motives above its legal duties and enabling, encouraging, and causing the over-supply and over-use of opioids;

    c.    Knowingly and intentionally (and/or negligently and recklessly) colluding with the opioid manufacturers in deceptive marketing schemes that were designed to, and successfully did, change the perception of opioids and cause opioid prescribing and sales to skyrocket;

    d.    Knowingly and intentionally (and/or negligently and recklessly) facilitating the increased use of opioids by giving opioids unwarranted preferred

formulary status in standard offerings in exchange for profiting from payments from the opioid manufacturers;

e.  Intentionally (and/or negligently and recklessly) maintaining preferred formulary status for OxyContin and other highly abused opioids in standard offerings, despite knowing, or being substantially certain, from its own extensive data, that addiction, abuse, and illegitimate prescribing of such drugs were rampant;

f.  Deliberately (and/or negligently and recklessly) electing not to undertake timely actions utilizing its real-time data that would have drastically reduced the inappropriate prescribing and dispensing of opioids, such as requiring prior authorization, step therapy, limiting days of supply, or excluding OxyContin from its standard formulary offerings;

g.  Deliberately (and/or negligently and recklessly) electing not to impose prior authorization requirements or limits on the availability of opioids in its standard formulary offerings in exchange for payments from the opioid manufacturers;

h.  Deliberately (and/or negligently and recklessly) electing not to maintain adequate safeguards to dispense opioids in a safe and effective manner and to maintain effective controls against diversion of opioids through its mail-order pharmacies; and

i.  Deliberately (and/or negligently and recklessly) electing not to report suspicious prescribers and pharmacies.

425.  It was, and remains, reasonably foreseeable that Express Scripts' actions and omissions would result in the harm to the State as described herein.

426.  The State has suffered and continues to suffer both injuries and pecuniary losses and harms proximately caused by Express Scripts' breaches. Among other things, and as discussed further herein, the State has experienced an unprecedented opioid addiction and overdose epidemic costing the State millions, paid for by the State, including, but not limited to, health benefit expenditures, treatment services, emergency visits, medical care, treatment for related illnesses and accidents, lost productivity, increased law enforcement and judicial expenditures, increased prison and public works expenditures, increased substance abuse treatment and diversion plan expenditures, lost economic activity, and lost reputation and goodwill. Express Scripts' breaches

of the statutory and common-law duties it owed to the State are the proximate cause of this crisis and its resultant harm to the State.

## COUNT TWO

### VIOLATION OF FEDERAL RICO, 18 U.S.C. § 1961, *et seq.*; § 1964(c)

427.    The State adopts, realleges, and incorporates by reference paragraphs 1 through 410 of this Complaint as if fully set forth herein and further alleges as follows.

428.    At all relevant times, Express Scripts was a "person" under 18 U.S.C. § 1961(3) because it was capable of holding, and does hold, legal or beneficial interests in property.

429.    As alleged more fully herein, Express Scripts formed an association-in-fact enterprise with each of the Opioid Enterprise Manufacturers, described above as the Formulary & UM Enterprise, for the purpose of carrying out a fraudulent scheme involving the felonious possession and dispensing of controlled substances to maximize profits for itself and the Opioid Enterprise Manufacturers by increasing sales of prescription opioids through unfettered and preferential formulary access without UM in its standard offerings, despite Express Scripts' promises, representations and contractual obligations to take actions, including through cDUR, formulary decisions, and UM decisions, that were in its clients' best interests, to ensure safe and medically appropriate opioids were being dispensed, and to address opioid abuse, misuse and diversion.

430.    As alleged more fully herein, the Formulary & UM Enterprise consisted of personal business relationships formed through contractual negotiations over decades and participation in and through the PCMA and other informal coalitions and working groups. Evidence of the existence of the Formulary & UM Enterprise can be found in the way in which Express Scripts conducted itself in its formulary and UM offerings, the contracts it negotiated with the Opioid

Enterprise Manufacturers that gave them preferential formulary positions and prohibited the implementation of UM measures, the research that it performed for Opioid Enterprise Manufacturers, pull-through marketing and PBM data exchange, its failure to comply with the dispensing requirements of the CSA and West Virginia law, and interactions through PCMA and other informal coalitions.

431.    At all relevant times, the Formulary & UM Enterprise (a) had an existence separate and distinct from each of the members; (b) was separate and distinct from the pattern of racketeering in which the members engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the members; (d) was characterized by interpersonal business relationships among the members; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as continuing units.

432.    Each member of the Formulary & UM Enterprise conducted, and participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding profits.

433.    Express Scripts carried out, or attempted to carry out, a scheme to defraud by knowingly conducting and participating in the conduct of the Formulary & UM Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) that made use of the mail and wire facilities in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

434.    Express Scripts committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the Formulary & UM Enterprise members committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constituted a

"pattern of racketeering activity." The racketeering activity was made possible by the Formulary & UM Enterprise members' regular use of the facilities, services, distribution channels, and employees of the Formulary & UM Enterprise. Express Scripts participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

435. Express Scripts also conducted and participated in the conduct of the affairs of the Formulary & UM Enterprise through a pattern of racketeering activity by the felonious manufacture, importation, receipt, concealment, buying, selling or otherwise dealing in controlled substances, punishable under any law of the United States.

436. Express Scripts committed crimes that are punishable as felonies under the laws of the United States. Specifically, 21 U.S.C. § 841 makes it unlawful for any person to knowingly or intentionally manufacture, distribute or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance except as authorized by Subchapter I of the CSA. A violation of § 841 in the case of controlled substances on Schedule II is punishable by not more than 20 years of imprisonment, or not less than 20 years imprisonment if death or serious bodily injury results from the use of such substance. Similarly, a violation of § 841 in the case of controlled substances on Schedule III is punishable by not more than 10 years imprisonment, or not less than 15 years imprisonment if death or serious bodily injury results from the use of such substance. Similarly, a violation of § 841 in the case of controlled substances in Schedule IV is punishable by not more than 5 years imprisonment. All three violations of § 841 are felonies.

437. Express Scripts' mail order pharmacy is a registrant as defined in the CSA. Its status as a registrant imposes obligations on it to ensure that it only dispenses "to the extent authorized by [its] registration and in conformity with the [CSA]."

438.    Express Scripts registered its mail order pharmacy with the DEA to dispense Schedule II-V controlled substances. Its DEA registration only authorized its owned pharmacy to "dispense" controlled substances, which "means to deliver a controlled substance to an ultimate user . . . by, or pursuant to the lawful order of, a practitioner."

439.    The Formulary & UM Enterprise's predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

   a.  Mail Fraud: The Formulary & UM Enterprise violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme of the Formulary & UM Enterprise;

   b.  Wire Fraud: The Formulary & UM Enterprise violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme of the Formulary & UM Enterprise; and

   c.  Felony Controlled Substance Violations: Express Scripts violated 21 U.S.C. § 841 by knowingly or intentionally possessing and dispensing controlled substances for reasons and purposes not authorized by the Controlled Substance Act.

440.    The Formulary & UM Enterprise conducted their pattern of racketeering activity in this jurisdiction and throughout the United States.

441.    The Formulary & UM Enterprise aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses, and the 21 U.S.C. § 841 offense.

442.    The members of the Formulary & UM Enterprise, with knowledge and intent, agreed to the overall objective of the Formulary & UM Enterprise, including the fraudulent scheme and felonious possession and dispensing of controlled substances, and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing, distributing, and dispensing prescription opioids.

443.    Indeed, for the Formulary & UM Enterprise's fraudulent scheme to work, each member of the Formulary & UM Enterprise had to agree to implement their necessary portion of the Formulary & UM Enterprise's activities in the manner alleged above.

444.    As alleged more fully herein, the Formulary & UM Enterprise engaged in a pattern of related and continuous predicate acts for years. The predicate acts were each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

445.    The predicate acts all had the purpose of creating the opioid epidemic that substantially injured West Virginia's business and property, while simultaneously generating billion-dollar revenue and profits for the Formulary & UM Enterprise. The predicate acts were conducted by members of the Formulary & UM Enterprise and in furtherance of its fraudulent scheme.

446.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

447.    Many of the precise dates of the Formulary & UM Enterprise's actions at issue here have been hidden by Express Scripts and the members of the Formulary & UM Enterprise and cannot be alleged without complete access to Express Scripts' books, records, and dispensing data. Indeed, an essential part of the successful operation of the Formulary & UM Enterprise alleged herein depended upon secrecy.

448.    It was foreseeable to Express Scripts and members of the Formulary & UM Enterprise that West Virginia would be harmed when they engaged in the fraudulent scheme that

forms the common purpose of the Formulary & UM Enterprise and the pattern of racketeering activities alleged herein.

449.    The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

450.    The Formulary & UM Enterprise members' violations of law and their pattern of racketeering activity directly and proximately caused West Virginia injury in its business and property.

451.    The Formulary & UM Enterprise members' pattern of racketeering activity logically, substantially and foreseeably caused an opioid epidemic. West Virginia was injured by the Formulary & UM Enterprise's pattern of racketeering activity and the opioid epidemic that its members created through their actions.

452.    Members of the Formulary & UM Enterprise knew that the prescription opioids at the center of their pattern of racketeering activity were extremely dangerous, highly addictive, prone to diversion, abuse and misuse, and often caused overdose and death. They were also aware that placing those drugs in favorable formulary positions without UM controls in place would grow the market for prescription opioids through increased prescribing, dispensing and sales. They were also aware that the growth in prescribing, dispensing and sales would be driven, in large part, by oversupply, addiction, and misuse and abuse. Members of the Formulary & UM Enterprise also knew that the oversupply, addiction, misuse and abuse would result in the writing of illegitimate prescriptions about which Express Scripts' mail-order pharmacies would need to conduct due diligence or refuse to fill.

453.    Nevertheless, members of the Formulary & UM Enterprise engaged in a scheme of deception, which utilized the mail and wires as part of their fraud, in order to increase prescribing

of prescription opioids, and to provide the Opioid Enterprise Manufacturers' drugs unfettered formulary access without limits from UM. Members of the Formulary & UM Enterprise also engaged in felonious possession and dispensing of controlled substances by filling prescriptions without performing due diligence and failing to refuse to fill prescriptions, thereby providing the Formulary & UM Enterprise with unfettered and illegal possession and dispensing by Express Scripts' mail order pharmacies.

454.    West Virginia was and continues to be damaged in its business and property by reason and as a result of the Defendants' conduct of the Enterprise through the pattern and practice of racketeering activity described herein, which was a logical, direct, foreseeable and substantial cause of the opioid epidemic.

455.    Specifically, West Virginia's injuries, as alleged throughout this complaint, and expressly incorporated herein by reference, include:

    a.  Losses caused by the decrease in funding available for West Virginia's public services resulting from the diversion of funds to public services addressing the opioid epidemic;

    b.  Costs for providing healthcare and medical care, additional therapeutic services, prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

    c.  Costs of training emergency and/or first responders in the proper treatment of drug overdoses;

    d.  Costs associated with providing police officers, firefighters, and emergency and/or first responders with naloxone, an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

    e.  Costs associated with emergency response by police officers, firefighters, and emergency and/or first responders to opioid overdoses;

    f.  Costs for providing treatment of infants born with opioid-related medical conditions, or born addicted to opioids due to drug use by a mother during pregnancy;

g.  Costs for providing mental health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

h.  Costs associated with law enforcement and public safety relating to the opioid epidemic, including but not limited to attempts to stop the flow of opioids into West Virginia, to arrest and prosecute street-level dealers, to prevent the opioid epidemic from spreading and worsening, and to deal with the increased levels of crimes that have directly resulted from the increased homeless and drug-addicted population;

i.  Costs associated with increased burden on West Virginia's judicial system, including increased security, increased staff, and the increased cost of adjudicating criminal matters due to the increase in crime directly resulting from opioid addiction;

j.  Costs associated with providing care for children whose parents are suffering from opioid-related disability or incapacitation;

k.  Loss of tax revenue due to the decreased efficiency and size of the working population in West Virginia's community;

l.  Losses caused by diminished property values in neighborhoods where the opioid epidemic has taken root; and

m.  Losses caused by diminished property values in the form of decreased business investment and tax revenue.

456.  West Virginia's injuries were proximately caused by Express Scripts' racketeering activities because they were a logical, substantial, and foreseeable cause of West Virginia's injuries. But for the opioid-addiction epidemic created by Express Scripts' conduct, West Virginia would not have lost money or property.

457.  West Virginia's injuries were directly caused by the pattern of racketeering activities by the members of the Formulary & UM Enterprise.

458.  West Virginia is most directly harmed and there are no other plaintiffs better suited to seek a remedy for the economic harms at issue here.

459.  West Virginia seeks all legal and equitable relief as allowed by law, including, *inter alia*, actual damages; treble damages; equitable and/or injunctive relief in the form of court

supervised corrective communication, actions and programs; forfeiture as deemed proper by the

Court; attorney's fees; all costs and expenses of suit; and pre- and post-judgment interest,

including, *inter alia*:

 a. Actual damages and treble damages, including pre-suit and post-judgment interest;

 b. An order enjoining any further violations of RICO;

 c. An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;

 d. An order enjoining the commission of any tortious conduct, as alleged in this Complaint;

 e. An order enjoining any future marketing or misrepresentations;

 f. An order enjoining future decisions by Express Scripts that prioritize rebates and profits over patient safety and proper, clinically based, decision making regarding formulary status, prior authorization, step therapy or UM measures related to prescription opioids;

 g. An order enjoining Express Scripts' mail order pharmacy from dispensing prescriptions without conducting proper due diligence and documenting that due diligence before dispensing any prescriptions;

 h. An order compelling Defendants to make corrective advertising statements that shall be made in the form, manner and duration as determined by the Court;

 i. An order enjoining any future lobbying or legislative efforts regarding the manufacture, marketing, distribution, prescription, or use of opioids;

 j. An order requiring Express Scripts to disclose publicly all documents, communications, records, data, information, research or studies concerning the health risks or benefits of opioid use;

 k. An order establishing a West Virginia foundation for education, research, publication, scholarship, and dissemination of information regarding the health risks of opioid use and abuse to be funded by Express Scripts in an amount to be determined by the Court;

 l. An order enjoining any diversion of opioids or any failure to monitor, identify, investigate, report and halt suspicious prescribing, dispensing, abuse, or diversion of opioids;

m.  An order requiring Express Scripts to publicly disclose to federal and state law enforcement all documents, communications, records, information, or data, regarding any prescriber, facility, pharmacy, clinic, hospital, manufacturer, distributor, person, entity or association regarding prescribing, dispensing, abuse, or diversion of opioids;

n.  An order divesting Express Scripts of any interest in, and the proceeds of any interest in, the Formulary & UM Enterprise, including any interest in property associated therewith;

o.  Dissolution and/or reorganization of any trade industry organization, or any other entity or association associated with the Formulary & UM Enterprise identified in this Complaint, as the Court sees fit;

p.  Dissolution and/or reorganization of any Defendant named in this Complaint as the Court sees fit;

q.  Suspension and/or revocation of licenses, registrations, permits, or prior approvals granted to Defendants, entities, associations or enterprises named in the Complaint regarding the prescribing or dispensing of opioids;

r.  Forfeiture as deemed appropriate by the Court; and

s.  Attorney's fees and all costs and expenses of suit

## COUNT THREE

## VIOLATIONS OF THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT

460.    The State adopts, realleges, and incorporates by reference paragraphs 1 through 410 of this Complaint as if fully set forth herein and further alleges as follows.

461.    The West Virginia Consumer Credit and Protection Act ("WVCCPA") prohibits an entity from using "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[103]

462.    Express Scripts' conduct as alleged herein above involves "trade or commerce" within the meaning of the WVCCPA.

---

[103] W. Va. Code § 46A-6-104.

463. Express Scripts' actions, as detailed above, constitute unfair or deceptive acts or practices that are prohibited by the WVCCPA.

464. Violations of statutes enacted to protect the consuming public or to promote a public interest are unfair or deceptive acts or practices. *See Final Order, State of West Virginia, ex rel. Darrell V. McGraw, Jr., Attorney General vs. David McCuskey et al.,* Kanawha County Circuit Court, Civil Action No. 01-C-3041, Mar. 13, 2003. *See also Pabon v. Recko,* 122 F. Supp.2d 311, 314 (D. Conn 2000); *Lemelledo v. Beneficial Management Corp. of America,* 674 A.2d 582 (N.J. Super. Ct., App. Div. 1996); *Winston Realty Co., Inc. v. G.H.G., Inc.,* 331 S.E.2d 677 (N.C. 1985).

465. Each occurrence of a failure to abide by laws and rules enacted to protect the consuming public or to promote a public interest constitutes an unfair or deceptive act or practice in violation of the WVCCPA, W. Va. Code § 46A-6-104.

466. Express Scripts' unfair, deceptive, and unconscionable acts or practices, or the effects thereof, are continuing, will continue, and are likely to recur unless permanently restrained and enjoined.

467. Consequently, the State seeks all available relief under the WVCCPA, including but not limited to disgorgement, restitution, civil penalties, equitable relief, injunctive relief, and attorneys' fees and costs.

468. As part of its WVCCPA action, the State expressly does not raise claims nor seek any damages attributable to the Medicaid or Medicare programs or any other federal programs. Additionally, as part of its WVCCPA action, the State expressly does not raise claims or seek any damages for the State's workers' compensation program, nor does it raise claims or seek damages on behalf of any state agencies.

## COUNT FOUR

## PUBLIC NUISANCE

469.    The State adopts, realleges, and incorporates by reference paragraphs 1 through 410 of this Complaint as if fully set forth herein and further alleges as follows.

470.    Express Scripts intentionally and/or negligently and recklessly caused, created, contributed to, and/or maintained a public nuisance which proximately caused injury to the State and interfered with public rights, including the public rights to health and safety, in the state of West Virginia.

471.    Through its conduct—detailed throughout this Complaint—Express Scripts has played a central role in fueling and prolonging the opioid epidemic in West Virginia. Its actions have significantly contributed to the widespread misuse, addiction, and diversion of prescription opioids throughout the State. *See* Restatement Second, Torts §821B.

472.    Express Scripts acquired and used vast troves of data on opioid prescribing and utilization in West Virginia. Yet instead of using this data to prevent harm, it used the information to increase profitability by promoting and facilitating access to opioids—despite clear and mounting evidence of abuse, overprescribing, and diversion.

473.    Express Scripts' misconduct includes, but is not limited to:

   a.    Colluding with opioid manufacturers to ensure opioids received favorable formulary placement and remained widely available, despite known risks;

   b.    Accepting manufacturer payments in exchange for declining to impose prior authorization requirements or other utilization controls;

   c.    Failing to act on evidence from its own claims data indicating abuse, overprescribing, and dangerous drug combinations ("cocktails") involving opioids;

   d.    Failing to maintain effective controls to prevent diversion in its PBM services and mail-order pharmacy operations; and

122

    e.   Dispensing opioids without adequate safeguards and in violation of the West Virginia Controlled Substances Act and related pharmacy regulations.

474.    Express Scripts placed its profit motives above its public health responsibilities, actively promoting opioids for conditions where they were neither safe nor effective. It misrepresented the risk of addiction and failed to take reasonable steps to curb abuse—despite having the authority and ability to do so.

475.    As a direct and foreseeable result, the opioid epidemic has devastated West Virginia, causing:

    a.   Skyrocketing rates of opioid addiction, overdose, and death;

    b.   The birth of opioid-dependent infants;

    c.   Collapsed workforce productivity;

    d.   The proliferation of an illegal secondary market for opioids; and

    e.   Significant burdens on the State's healthcare, law enforcement, and social services systems.

476.    Express Scripts had a duty to the State and its residents to act reasonably in delivering, dispensing, managing, and promoting opioids. That duty arose from its unique gatekeeping role in the pharmaceutical supply chain and from the foreseeability of harm posed by its conduct. It breached that duty in multiple, ongoing ways.

477.    Express Scripts' actions were a substantial factor in creating and sustaining the public nuisance. Without its conduct—including its formulary decisions, collusion with manufacturers, failure to act on red flags, and facilitation of widespread access—opioid misuse and the resulting epidemic would not have occurred at this scale in West Virginia.

478. The nuisance created by Express Scripts is substantial, unreasonable, and continuing. The resulting harm—including death, addiction, social disorder, and financial loss—is far greater than any purported benefit of its conduct.

479. Express Scripts exercised control over the instrumentalities of the nuisance: it controlled access to prescription opioids, colluded in their promotion, and managed formulary and UM systems that drove opioid proliferation in the State.

480. West Virginia has suffered both generalized harm to its public and proprietary harm to its property and resources as a result of this nuisance. These injuries include extraordinary costs for healthcare, criminal justice, emergency response, child protection, and public health—costs that go well beyond the ordinary obligations of government.

481. The nuisance is abatable, but Express Scripts lacks the capacity and trustworthiness to perform the abatement, having consistently elevated profit over safety and public health.

482. The State seeks a judgment requiring Express Scripts to fund abatement of the public nuisance and to cease further nuisance-creating conduct. The State also seeks compensatory damages, punitive or exemplary damages, attorneys' fees, costs, and all other appropriate legal and equitable relief under West Virginia law.

483. At all relevant times, Express Scripts was (or reasonably should have been) aware of, and understood, its legal obligations under the federal Controlled Substances Act (21 U.S.C. § 801, *et seq.),* the West Virginia Controlled Substances Act, W.Va. Code C.S.R. § 15-2-1, *et seq.,* and applicable West Virginia pharmacy laws and regulations regarding the dispensing of prescription opioids.

484. In its sale and dispensation of opioids, and "cocktails" of opioids and other drugs, in this District and the state of West Virginia, Express Scripts violated federal law, including, but

not limited to, 21 U.S.C.A. §§ 829, 841, 842 and 21 C.F.R. §§ 1301.71, 1306.04, 1306.06, and West Virginia law, including, but not limited to, W. Va. C.S.R. § 15-2-3 (previously W.Va. C.S.R. § 15-2-2), W. Va. C.S.R. § 15- 2-4, W.Va. C.S.R. § 15-2-4.4, W.Va. C.S.R. § 15-2-4.5, W. Va. C.S.R. § 15-2-5.1.1 (previously W. Va. C.S.R. § 15-2-4.2.1), W. Va. C.S.R. § 15-2-5.3 (previously W.Va. C.S.R. § 15-2-4.4), W. Va. C.S.R. § 15-2-5 (previously W. Va. C.S.R. § 15-2-4), W.Va. Code § 60A-4-401(a), W. Va. Code § 60A-8-7(c)(1)(I); W. Va. Code § 60A-8-7(c)(3); and W. Va. Code § 60A-3-308(d)(l). Express Scripts' violations of these laws were committed knowingly and/or negligently and recklessly.

485.    At all relevant times, Express Scripts knew or reasonably should have known that prescription opioids were dangerous because, *inter alia*, these drugs are defined under federal and state law, and are generally recognized, as substances posing a high potential for abuse, addiction, and death.

486.    West Virginia recognizes that not every societal harm supports a public nuisance claim. But the opioid crisis is no ordinary harm. It is a manmade, preventable public health catastrophe—unprecedented in scale—that has shattered families, strained public resources, and devastated the State. Given the crisis's magnitude, foreseeability, and systemic nature, West Virginia respectfully submits that it meets the threshold for public nuisance liability. In doing so, the State does not contend that the lawful distribution of other regulated products necessarily gives rise to similar claims.

## COUNT FIVE

## CIVIL CONSPIRACY

487.    The State adopts, realleges, and incorporates by reference paragraphs 1 through 410 of this Complaint as if fully set forth herein and further alleges as follows.

488.    As alleged in these paragraphs, Express Scripts and the opioid manufacturers engaged in concerted action to accomplish an unlawful objective, or a lawful objective by unlawful means—namely, the unfettered sale and dispensing of vast quantities of opioids in West Virginia, without regard to patient safety, community impact, or compliance with state law. Each of the Express Scripts defendants either actively participated and/or aided and abetted in the pursuance of this common purpose.

489.    Specifically, opioid manufacturers contracted and agreed with PBMs, including Express Scripts, to coordinate unfettered formulary placement with no or limited UM measures regarding each opioid drug in Express Scripts' standard offerings, such that there would be as few impediments as possible to opioid prescribing and dispensing. These contracts relied on an underlying fraudulent scheme designed to ensure unfettered access to PBM formulary offerings. The opioid manufacturers understood that Express Scripts was going to operate on a fundamentally fraudulent basis. As alleged more fully herein, Express Scripts promised its clients that it would implement safeguards to ensure the safe prescribing and dispensing of opioids. However, Express Scripts had no intention of implementing such measures for opioid manufacturers' branded and generic drugs. Doing so would have significantly reduced its rebates, dispensing revenue, and other fees. Simultaneously, Express Scripts operated its mail-order pharmacies in a manner that permitted the dispensing of obviously illegitimate prescriptions without intervention.

490.    As detailed herein, Express Scripts and the opioid manufacturers committed numerous overt acts to further the conspiracy's objectives that were unlawful under West Virginia law.

491.    At all relevant times, Express Scripts was aware of the enterprise's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct in the form of increased sales, distributions, and prescriptions of opioids.

492.    By knowingly misrepresenting the appropriate uses, risks, and safety of opioids, Express Scripts committed overt acts in furtherance of its conspiracy.

493.    As an intended result of the intentional wrongful conduct as set forth herein, Express Scripts has profited and benefited from the opioid epidemic it helped cause, thereby harming West Virginia and its community.

494.    As a proximate result of Express Scripts' and its co-conspirators, the opioid manufacturers', intentional wrongful conduct, West Virginia has incurred substantial costs including, but not limited to, law enforcement action for opioid-related drug crimes, for addiction treatment, and other services necessary for the treatment of populations addicted to prescription opioids, and the other harms alleged herein. Similarly, abating the vast societal harms Express Scripts and its co-conspirators caused will require extensive efforts and substantial resources.

495.    West Virginia seeks to impute liability for West Virginia's other claims on Express Scripts for the wrongful conduct of its co-conspirators, the opioid manufacturers, and to hold Express Scripts jointly and severally liable for that conduct.

496.    Additionally, as discussed above, the conduct of Express Scripts and its co-conspirators, the opioid manufacturers, was fraudulent, malicious, and/or grossly negligent. For this reason, West Virginia seeks to recover punitive/exemplary damages.

## VI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, the State of West Virginia, respectfully requests the Court Order the following relief, including:

a.  Abatement of nuisance;

b.  Actual damages;

c.  Treble or multiple damages and civil penalties as allowed by statute;

d.  Punitive damages;

e.  Exemplary damages;

f.  Disgorgement of unjust enrichment;

g.  Equitable and injunctive relief in the form of Court-enforced corrective action, programs, and communications;

h.  Forfeiture, disgorgement, restitution and/or divestiture of proceeds and assets;

i.  Attorneys' fees;

j.  Costs and expenses of suit;

k.  Pre- and post-judgment interest; and

l.  Such other and further relief as this Court deems appropriate.

## VII.    <u>JURY DEMAND</u>

Plaintiff, the State of West Virginia, *ex rel.* John B. McCuskey, in his capacity as Attorney General, demands trial by jury on all issues so triable.


Dated: August 15, 2025                   Respectfully submitted,

**JOHN B. MCCUSKEY,**
**ATTORNEY GENERAL OF WEST VIRGINIA**

 */s/ Jace H. Goins*
Jace H. Goins (WVSB #6894)
  *Chief Deputy Attorney General*
Abby Cunningham (WVSB #13388)
  *Assistant Attorney General*

Office of the West Virginia Attorney General
P.O. Box 1789
Charleston, WV 25326
Telephone: (304) 558-8986

Jace.H.Goins@wvago.gov
Abby.G.Cunningham@wvago.gov

*Counsel for the State of West Virginia*

Ryan Donovan (WVSB #11660)
Michael Hissam (WVSB #11526)
HISSAM FORMAN DONOVAN RITCHIE, PLLC
700 Virginia St. East, Suite 210
Charleston, WV 25301
Telephone: (681) 265-3802
rdonovan@hfdrlaw.com
mhissam@hfdrlaw.com

*Special Assistant Attorneys General*
*for the State of West Virginia*